1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA,          :
                                   :
  v.                               :
                                   :    CASE NUMBER CR-4:18-00147
HERMAN WILLIAMS                    :
and VINCENT HOOPER,                :
                                   :
      Defendants.                  :
_____

PARTIAL TRANSCRIPT OF MOTION/EVIDENTIARY HEARING
(Pertaining to Vincent Hooper)

Before the Honorable Christopher L. Ray
United States Magistrate Judge

United States Courthouse
125 Bull Street
Savannah, Georgia
January 24, 2019

TRANSCRIBED BY:   Victoria L. Root, CCR
                  United States Court Reporter
                  Post Office Box 10552
                  Savannah, Georgia  31412
                  (912) 650-4066

2

1                         A P P E A R A N C E S

2


3     FOR THE GOVERNMENT:

4             CHRISTOPHER HOWARD, Esquire
              Assistant United States Attorney
5             Post Office Box 8970
              Savannah, Georgia   31412
6             (912) 652-4422

7


8     FOR DEFENDANT HOOPER:

9             CAMERON C. KUHLMAN, Esquire
              Duffy & Feemster, LLC
10            340 Eisenhower Drive, Suite 800
              Savannah, Georgia   31406
11            (912) 236-6311

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

                                                              Page

PROCEEDINGS.  .   .   .   .   .   .   .   .   .   .   .   .   .   .        6


DEFENDANT HOOPER'S BRADY MOTION AND MOTION TO
DISCLOSE EVIDENCE.  .   .   .   .   .   .   .   .   .   .   .   .        6


DEFENDANT HOOPER'S MOTION TO SUPPRESS.  .   .   .   .   .   .   .        7


WITNESSES FOR THE GOVERNMENT

          1.  KEVIN JARRIEL
              Direct Examination by Mr. Howard.  .   .   .   .        9
              Cross-Examination by Mr. Kuhlman.  .   .   .   .       50
              Redirect Examination by Mr. Howard.  .   .   .       58

          2.  JOSEPH HOOD
              Direct Examination by Mr. Howard.  .   .   .   .       59
              Cross-Examination by Mr. Kuhlman.  .   .   .   .       67
              Redirect Examination by Mr. Howard.  .   .   .       75
              Recross-Examination by Mr. Kuhlman.  .   .   .       75

          3.  THOMAS PLUMLEY
              Direct Examination by Mr. Howard.  .   .   .   .       76
              Cross-Examination by Mr. Kuhlman.  .   .   .   .       92
              Redirect Examination by Mr. Howard.  .   .   .       95

          4.  KEVIN McKOON
              Direct Examination by Mr. Howard.  .   .   .   .       96


WITNESS FOR DEFENDANT HOOPER

          1.  AMIR MOUSTAFA
              Direct Examination by Mr. Kuhlman  .   .   .   .      102
              Cross-Examination by Mr. Howard .   .   .   .   .      107
              Redirect Examination by Mr. Kuhlman  .   .   .      108

4

1                         I N D E X (Continued)

2

3                                                          Page

4    WITNESS RE-CALLED FOR THE GOVERNMENT

5         1.  KEVIN JARRIEL
              Further Redirect Examination
6               by Mr. Howard . . . . . . . . . . . . .   112
                Recross-Examination by Mr. Kuhlman. . . .  114

7

8    CLOSING ARGUMENTS
              By Mr. Kuhlman. . . . . . . . . . . . . . .  115
9             By Mr. Howard . . . . . . . . . . . . . . .  116
              By Mr. Kuhlman. . . . . . . . . . . . . . .  121
10            By Mr. Howard . . . . . . . . . . . . . . .  122

11
     CERTIFICATE OF REPORTER. . . . . . . . . . . . . . .  124
12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                               E X H I B I T S

2

3      EXHIBIT NUMBER          IDENTIFIED      TENDERED      ADMITTED

4      Government's A              –              9             9
       Government's B             11              9             9
5      Government's C             12              9             9
       Government's D              –              9             9
6      Government's E              –              9             9
       Government's F             19              9             9
7      Government's G             22              9             9
       Government's H             22              9             9
8      Government's I              –              9             9
       Government's J             25              9             9
9      Government's K             49              9             9
       Government's L             49              9             9
10     Government's M             93              9             9
       Government's N             87              9             9
11     Government's O             80              9             9
       Government's Z             89             90            91
12

13

14                               –   –   –

15

16     Defendant's 2            110            110           110
       Defendant's 3            104              –           111
17     Defendant's 5             70             70            70
       Defendant's 6             72             72            72
18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

-oOo-

(Proceedings reconvened at 11:12 a.m.)

COURT SECURITY OFFICER:  All rise.  This honorable court is back in session.  Be seated and come to order.

THE COURT:  All right.  Good morning.  According to my sheet, we are here on four motions for Mr. Hooper: a *Brady* motion, a motion to disclose evidence, a motion to suppress the search, and a motion to suppress statements.

Is that right, Mr. Kuhlman?

MR. KUHLMAN:  That's right, Your Honor.  Good morning again.  I think as -- as to the first two motions, the *Brady* motion and the motion to disclose evidence, I think my position is similar to that of Mr. Withers.  Just as those motions remain outstanding, the Government has continued its rolling production in this case, and I'm just trying to preserve those issues.

THE COURT:  I understand.

Mr. Howard, any response?

MR. HOWARD:  Not any different than previously said. I would like to note for the record that, as Counsel made reference to the rolling production, the -- after Counsel had filed his motion in this case, I was able to locate a report by Agent Hood that was included in my response.  And so at the time Counsel had that -- had -- was drafting that motion,

1   he did not have the report.  That's the report that we've

2   referenced in our response.

3         So I want to be very up front that Counsel certainly

4   was not omitting any information.  He simply did not have it at

5   the time.  So I want to make that clear.  But no, no other

6   responses to the discovery motions, Your Honor.

7         THE COURT:  All right.  Thank you, Mr. Howard.

8         I think that addresses, then, Defendant's Documents

9   258 and 259.  So let's move on, then, to the motion to suppress

10  the search, if we may, Defendant's Document 261.

11        MR. KUHLMAN:  Thank you, Your Honor.  You know,

12  there's no question that this is a complex case from the

13  Government's perspective, but, really, there's only one

14  essential question underlying both of our motions to suppress,

15  and that's whether Mr. Hooper's submission to the show of

16  authority and lethal force by the local -- by the law

17  enforcement officers, you know, validates the search of his

18  house, the search of a locked safe, and the statements he made

19  after the contents of that safe were discovered.  That's what

20  we're here on, not the -- you know, the overarching conspiracy.

21        THE COURT:  All right.  Understood.  Well, it's your

22  motion, Mr. Kuhlman.

23        Any witnesses?  Any evidence?

24        MR. KUHLMAN:  Well, Your Honor, I think that the --

25  we're -- we can call one -- you know, we can call a case agent

1   and establish the absence of a warrant, and then the burden

2   shifts to the Government.

3           THE COURT:  Or would you rather just let the

4   Government put its case up and --

5           MR. KUHLMAN:  I don't --

6           THE COURT:  -- take him on cross?

7           MR. KUHLMAN:  You know, to the extent the Court --

8   I'm happy to allow the Government --

9           THE COURT:  I'm okay --

10          MR. KUHLMAN:  -- to move forward.

11          THE COURT:  -- with that.

12          Mr. Howard, are you okay with you that procedure?

13          MR. HOWARD:  Yes, Your Honor.

14          THE COURT:  Then let's let the Government proceed,

15  then.

16          MR. HOWARD:  And the Government would call Task Force

17  Officer Kevin Jarriel, who's already testified here today.

18          MR. KUHLMAN:  And, again, we would invoke the rule.

19  I think everybody's --

20          MR. HOWARD:  Your Honor, DEA Agent Task Force Officer

21  Berry Ripley is also here.  I don't anticipate or expect to

22  have him testify.  He is, you know, one of the elite agents in

23  the case and I think has an interest in the case, but I don't

24  expect him to testify.

25          THE COURT:  As long as that representation is true,

1    that he will not take the stand.  In fact, we'll have to treat

2    it that way if he's going to sit here and watch, so --

3                   MR. HOWARD:  Understood, Your Honor.

4                   THE COURT:  That's fine.

5                   Mr. Jarriel, you can take the stand.

6                   COURT CLERK:  Sir, again, you have previously been

7    sworn.  If you would, please, be seated.

8                   State your name and your occupation for the record.

9                   THE WITNESS:  My name's Kevin Jarriel with the

10   Counter Narcotics Team currently assigned as a TFO with the

11   drug enforcement office here in Savannah.

12                  MR. HOWARD:  And, Your Honor, before I begin, another

13   housekeeping -- I would move to admit the exhibits that were

14   attached to our response.  They are Exhibits A through O.  And

15   I have a copy of those for the Court as well.

16                  THE COURT:  Mr. Kuhlman, any objection?

17                  MR. KUHLMAN:  No objection, Your Honor.

18                  THE COURT:  Okay.  All right.  Exhibits A through O

19   are admitted without objection.  You may proceed.

20                           KEVIN JARRIEL,

21   having been previously sworn, was examined and testified as

22   follows:

23                       DIRECT EXAMINATION

24   BY MR. HOWARD:

25   Q.   Officer Jarriel, we heard about your -- a little bit about

1    your experience.

2        You're currently with the DEA; correct?

3    A.    Yes, sir.

4    Q.    And with DEA and CNT, your focus has been primarily on

5    investigating drug trafficking organizations?

6    A.    That's correct, sir.

7    Q.    And you were involved in the investigation involving

8    Omar Griffin and others in this case; correct?

9    A.    Yes, sir.

10   Q.    Okay.   Was Barrington Miller identified as a part of that

11   organization?

12   A.    Yes, sir.

13   Q.    Where did Mr. Miller live?

14   A.    He lived on 19 Helmken Street in Savannah, Georgia.

15   Q.    Were there controlled purchases of cocaine made from that

16   residence from Mr. Miller in December of 2017?

17   A.    Yes, sir.

18   Q.    Did you obtain court-authorized wiretaps for Mr. Miller's

19   phone?

20   A.    Yes, sir.

21   Q.    Were there any calls between Mr. Miller and Vincent Hooper

22   that were intercepted?

23   A.    Yes, sir.

24   Q.    And I draw your attention to Exhibit B, which is in the

25   accordion folder in front of you, and ask if you recognize

1   that.

2   A.    Yes, sir, I do.

3   Q.    What are those?

4   A.    These are the printouts that are distributed by our

5   wiretapping software that we use.  Prevent -- prints out dates,

6   times, substance of calls.

7   Q.    Okay.  And do -- those specific line sheets that you have

8   in front of you in Exhibit B, are they specific as to calls

9   between two individuals?

10  A.    Yes, sir.  It references the target, which would be

11  Mr. Barrington Miller, and then who was contacted, Mr. Vincent

12  Hooper.  It also provides the phone numbers.

13  Q.    Okay.  Approximately how many calls are referenced there?

14  A.    Approximately 18, some answered calls, some unanswered

15  calls.

16  Q.    And in terms of the date frame of the 18 calls, the first

17  and the last, are we talking about a month or two?

18  A.    Yes, sir.  It appears the end of January, January 24th,

19  2018, was being the first contact.

20          THE COURT:  Mr. Howard, can I interrupt you just one

21  second?

22          Mr. Kuhlman, in light of the fact that the

23  Government's going to need the same witnesses on both motions,

24  both the motion to suppress the search and the motion to

25  suppress the statement, any objection if we combine the

1    evidence and the argument for both motions in one presentation?

2         MR. KUHLMAN:  No objection.  In fact, Defense, I

3    think, would prefer it.

4         THE COURT:  Yeah.  So if -- Mr. Howard, keep that in

5    mind, if you would.  Let's just do it as one om- --

6         MR. HOWARD:  I --

7         THE COURT:  -- one omnibus presentation.

8         MR. HOWARD:  Will do, Your Honor.

9    BY MR. HOWARD:

10   Q.   All right.  So there's about 18 calls that are referenced

11   there between Mr. Hooper and Mr. Miller in about a month time

12   frame?

13   A.   Correct, sir.

14   Q.   Did law enforcement also have a pole camera on

15   Mr. Miller's residence?

16   A.   That's correct, sir.

17   Q.   And in that pole camera, did it reflect several visits by

18   Mr. Hooper?

19   A.   That's correct.

20   Q.   And is that pole camera a log in Exhibit C?

21   A.   Yes, sir.

22   Q.   Okay.  And I'm not going to make you go through each of

23   those pages, but can you explain to the Court what a pole

24   camera log is?

25   A.   During our investigations, we'll have a -- an agent that's

1   assigned to the pole camera to monitor any activity: cars

2   coming and going, any notable drug activity; try to record tag

3   numbers, any identified persons, times they were there, times

4   that they departed; things of that sort.

5   Q.    Okay.  It's kind of what the agent is seeing at the time

6   on that pole camera, watching; right?

7   A.    Correct, sir.

8   Q.    And a number of times, Mr. Hooper was seen visiting

9   that -- 19 Helmken Street where Barrington Miller lived;

10  correct?

11  A.    Yes, sir.

12  Q.    And I'm not going to ask you the specific dates in there,

13  but is it fair to reflect -- is it fair that Exhibit C

14  reflects, you know, approximately seven or more separate days

15  when Mr. Miller -- where Mr. Hooper was seen going to and from

16  Mr. Miller's residence, 19 Helmken?

17          MR. KUHLMAN:  I'm going to object to the -- you know,

18  if the witness is prepared to -- if the witness wants to review

19  the document and count them out, that's fine, but Mr. Hoop- --

20  I mean, Mr. Howard -- excuse me -- wants to tell him the number

21  in his question, you know.  Who's testifying at that point?

22          MR. HOWARD:  And I can -- if Your Honor would like,

23  I can direct him to certain pages.

24          THE COURT:  Objection sustained.

25          MR. HOWARD:  Okay.

14

1      THE COURT:  If you'd rephrase.

2  BY MR. HOWARD:

3  Q.    Agent Jarriel, I don't believe there are page numbers on

4  there, so I'm just going to direct you to some specific pages

5  and ask you to flip to those pages.  Okay?

6  A.    Okay, Mr. Howard.  And I have the dates on here, too --

7  Q.    Okay.  Great.

8  A.    -- whatever is the best way to --

9  Q.    Let's do it.

10  A.    -- direct me to that.

11  Q.    Well, if you'd turn to Page 11.

12  A.    Okay.  I don't have page numbers on this --

13  Q.    All right.  Let's --

14  A.    -- particular one, so --

15  Q.    Well, I'm going to ask you to just count in your --

16  A.    Okay.  Gotcha.

17        Okay.  I'm looking at what would be Page 11.

18  Q.    All right.  Do you see a reference there to Mr. Hooper?

19        THE COURT:  Mr. Howard, what date and timestamp are

20  you --

21        MR. HOWARD:  Yeah.

22        THE COURT:  -- looking at?

23        MR. HOWARD:  Let's do that.

24  BY MR. HOWARD:

25  Q.    So if you go to December 27th . . .

1    A.    Okay.  December 27th.  Okay.

2    Q.    All right.  Looking at that, do you see any reference to

3  Mr. Hooper?

4    A.    Yes, at 1746 hours.  I could read the excerpt if you'd

5  like me to.

6    Q.    But do you understand -- is there a reference to

7  Mr. Hooper there?

8    A.    Yes, there is.

9    Q.    And you understand the reference to Hooper there is a

10  reference to this defendant in this case --

11    A.    Correct.

12    Q.    -- Vincent Hooper?

13    A.    Yes, sir.

14    Q.    In the course of the investigation, were you able to

15  identify what kind of vehicle Mr. Hooper was associated with?

16    A.    Yes, sir.

17    Q.    What was that?

18    A.    It was a small Honda sedan.

19    Q.    And at 1746, there's a reference, "They leave towards

20  Wheaton in Hooper's silver Honda"?

21    A.    Correct.

22    Q.    All right.  Let's go to January 5th.

23    A.    Okay.

24    Q.    And do you see a reference to Mr. Hooper there,

25  specifically at 1717 hours?

1  A.    Yes, I do, sir.

2  Q.    And is there a reference, then, to Hooper arriving in a

3  silver Honda?

4  A.    Yes, sir.

5  Q.    All right.  January 27th, 1754, is there a Vincent Hooper

6  reference there?

7  A.    Yes, sir.

8  Q.    January 31st -- and just going back to January 27, it says

9  "possibly Vincent Hooper"; correct?

10 A.    Correct, sir.

11 Q.    So January 31st at 1746 hours, is Mr. Hooper seen there as

12 well?

13 A.    Correct, sir.

14 Q.    February 1st, 1115 hours, is there a reference to

15 Vincent Hooper being seen at 19 Helmken?

16 A.    Correct, sir.

17 Q.    February 3rd --

18 A.    Yes, sir.

19 Q.    -- at 1732, is there a reference to Mr. Hooper?

20 A.    Yes, sir.  I see it at 1330 and 1732.

21 Q.    And then even -- there's an asterisk there referring to

22 a specific call referencing Hooper, stating he was at the

23 target location checking on Miller's dogs; correct?

24 A.    Correct, sir.

25 Q.    February 25th --

1    A.    Yes, sir.

2    Q.    -- is there -- do you see a 1029 hours reference to

3    Vincent Hooper?

4    A.    Yes, sir, I do.

5    Q.    And let's go to March 6th.

6    A.    Yes, sir.

7    Q.    And do you see a reference there at 1802 hours?

8    A.    Yes, sir, I do.

9    Q.    Can you read that reference.

10   A.    "Miller leaves residence with bag, gets in Hooper's

11   vehicle, and then leaves area."

12   Q.    Yeah.   On March 6th, 2018, tell me the context of what's

13   happening in your investigation (inaudible)?

14   A.    On the 6th, as far as the investigation goes, you could

15   say the cat was out of the bag at that point.   The arrest had

16   been made of some of the other codefendants.   And from what we

17   could tell, some of the conspirators that were still at large

18   at that point were aware of a lot of the enforcement action the

19   police were taking at the time.

20   Q.    Okay.   So -- that's March 6th.   Let me take you back to

21   March 5th, 2018.

22        Did law enforcement find a significant amount of cocaine

23   on that day?

24   A.    Yes, sir.

25   Q.    Was it seized from Omar Griffin's car?

1  A.    Correct, sir.

2  Q.    Who was driving that car?

3  A.    A Mr. Barron Robertson.

4  Q.    Was he arrested?

5  A.    He was, sir.

6  Q.    And were there several other individuals in the

7  investigation who were arrested that day including

8  Herman Williams?

9  A.    Correct, sir.

10 Q.    Was Omar Griffin arrested that day?

11 A.    No, sir.

12 Q.    Why not?

13 A.    Due to a foot chase and quick escape on his part, he still

14 remains at large.

15 Q.    And he stole CNT Agent Minton's car; correct?

16 A.    Yes, sir.

17 Q.    All right.  So later that day, just staying on March 5th,

18 2018, did law enforcement intercept a telephone call between

19 Barrington Miller and Justin Swinton?

20 A.    That's correct, sir.

21 Q.    And explain to the Court who Justin Swinton is as it

22 relates to this investigation.

23 A.    Mr. Swinton was the -- one of the targets in our

24 investigation.  We ended up constructing a wiretap on his

25 cellular phone based off his activities with the other

1    conspirators and identified him as a marijuana distributor.

2    Q.    And he's been charged in this case?

3    A.    Yes, sir.

4    Q.    And has signed a plea agreement; is that correct?

5    A.    Correct, sir.

6    Q.    I would direct your attention to Exhibit F.

7    A.    Yes, sir.

8    Q.    Do you recognize that?

9    A.    Yes, sir.

10   Q.    What is that?

11   A.    That's the disc with one of the intercept recordings you

12   showed me.

13   Q.    Between Barrington Miller and Justin Swinton?

14   A.    Correct, sir.

15   Q.    Did you listen to that?

16   A.    Yes, sir.

17   Q.    Did you initial that disc?

18   A.    I did, sir.

19   Q.    All right.

20           MR. HOWARD:   Your Honor, it's already been admitted.

21   I'd ask for permission to play Exhibit F.

22           THE COURT:   You may.

23   BY MR. HOWARD:

24   Q.    And, Agent, is this about a 7-minute call?

25   A.    Yes.  It's a lengthy call.

20

1   Q.    All right.

2         MR. HOWARD:    And, Your Honor, I'll only play certain

3   excerpts of it.

4         (Video playing.)

5         MR. HOWARD:    Okay.   Pause it there.

6         (Video paused.)

7   BY MR. HOWARD:

8   Q.    Do you recognize the voices?

9   A.    Yes, sir.

10  Q.    And who's speaking there?

11  A.    The gentleman with the accent is Mr. Barrington Miller.

12  The other gentleman is Mr. Justin Swinton.

13  Q.    All right.   And you heard a reference to "Unc got bammed

14  out"?

15  A.    Correct.

16  Q.    Was there an individual in this investigation that was

17  identified as "Unc"?

18  A.    Correct.

19  Q.    Who is that?

20  A.    Mr. Herman Williams.

21  Q.    Okay.   And the time frame of this, was this after

22  Herman Williams was arrested on March 5th?

23  A.    That's correct.

24  Q.    Okay.   And this call, is it a March 5th, 2018, call?

25  A.    Yes, I believe so.

1    Q.    Okay.   So what did you understand it to mean when he said,

2    "Unc got bammed out"?

3    A.    Based off the intercepts we had listened to before, it was

4    an alert from Mr. Swinton to Mr. Miller that Mr. Williams and

5    Mr. Griffin had been intercepted by law enforcement.

6              MR. HOWARD:   Okay.   If we could skip ahead to about

7    the 4:50 mark.   That's fine.

8              Your Honor, we'll play -- if we could play just about

9    a minute of this and then stop.

10         (Video playing.)

11             MR. HOWARD:   If we could pause it right there.

12         (Video paused.)

13   BY MR. HOWARD:

14   Q.    Agent, you heard references to "I'm about to clean up

15   my house right here and go around the corner" and then later

16   saying, "I'm about to clean up my house."

17         Who was saying that?

18   A.    Mr. Miller.

19   Q.    And what did you understand him to mean when he's talking

20   about cleaning out his house?

21   A.    Based off everything that happened before and then the

22   contents of that conversation, what I understood -- you know,

23   what their concern was they were going to clean up any evidence

24   that may be in his residence, particularly at 19 Helmken

25   Street.

1   Q.    Okay.   And 19 Helmken, again, was the location where a

2   controlled purchase of cocaine was made previously to that?

3   A.    Yes, sir.

4   Q.    That night, was there a warrant obtained for Mr. Miller's

5   arrest?

6   A.    That's correct.

7   Q.    And turning to Exhibit G, do you recognize that as the

8   warrant?

9   A.    Yes, sir, I do.

10            MR. HOWARD:   Let's go ahead and mark 6.

11  BY MR. HOWARD:

12  Q.    And turning back to the pole cam log, we mentioned that

13  Mr. Miller was seen on the pole cam leaving Helmken Street;

14  correct?

15  A.    Yes, particularly at 1802 hours.

16  Q.    And whose vehicle does it say he got in?

17  A.    "Miller leaves residence with bag in hand, gets in

18  Hooper's vehicle, and leaves the area."

19  Q.    You also had a warrant for Mr. Miller's cell site location

20  information; correct?

21  A.    That's correct, sir.

22  Q.    Is that warrant reflected in Government's Exhibit H?

23  A.    That's correct, sir.

24  Q.    And were you using the cell site location information to

25  track down Barrington Miller?

1  A.    Yes, sir.  It was -- our primary focus then was to obtain

2  location information for the purpose of his arrest with this

3  pen -- trap and trace order.

4        MR. HOWARD:  Let's mark 6.  Let's go ahead and

5  mark 7.  Okay?

6  BY MR. HOWARD:

7  Q.    On the evening of March 7th, were you able to approximate

8  the area where Mr. Miller's phone was?

9  A.    Yes, sir.

10  Q.   Do you recall approximately where it was?

11  A.   There was two different notable locations.  First was in

12  the Beaufort, South Carolina, area.  Then later in the evening,

13  it was on the area of Palm Avenue, specifically near the

14  residences of 8 and 10 Palm Avenue when we first started

15  looking at it.

16  Q.   And in the course of your investigation, the -- you know,

17  8 Palm Avenue, that is ringing a bell to you?

18  A.   It did.  We -- I had recalled that Mr. Miller had an

19  associate, which was Mr. Hooper, and he had listed that address

20  of 8 Palm Avenue and -- or -- excuse me -- we were able to note

21  that that address had been listed for him, 8 Palm Avenue,

22  through one of our law enforcement databases.

23  Q.   And did you, along with several other law enforcement

24  officers, go to Palm Avenue to execute that arrest warrant?

25  A.   Yes, sir, we did.

1  Q.    And at the time -- so we're going back to March 7th,

2  2018 -- were you with CNT, or had you officially started with

3  DEA?

4  A.    I was still with CNT.

5  Q.    Okay.  Were you wearing a body camera?

6  A.    I was not, no, sir.

7  Q.    And was that typically the case with CNT, that you would

8  not wear a body camera?

9  A.    That's correct.  We did not wear.

10 Q.    Was K-9 Officer Benjamin Ferrero with you?

11 A.    Yes, sir.  He was working on the -- with us.

12 Q.    And is he with the Savannah Police Department?

13 A.    Yes, sir.

14 Q.    Was he wearing a body camera that recorded events that

15 evening?

16 A.    Yes, sir.

17 Q.    And have you reviewed the video from Officer Ferrero's

18 body-worn camera?

19 A.    Yes, sir.

20 Q.    And does it fairly and accurately reflect the events of

21 that evening?

22 A.    Yes, sir.

23 Q.    If you would, turn to Exhibit J.

24 A.    Yes, sir.

25 Q.    I'd ask you if you would review that and let me know if

1  you recognize that.

2  A.    Yes, sir.

3  Q.    What is it?

4  A.    It's a disc, I believe, with the body-worn camera footage.

5  Q.    For Officer Ferrero; correct?

6  A.    Correct, sir.

7  Q.    And did you initial that?

8  A.    Yes, sir.

9         MR. HOWARD:  Your Honor, if we could play Exhibit J.

10        THE COURT:  You may.

11        Will this be excerpted again or in toto?

12        MR. HOWARD:  Your Honor, this is the -- well, I'm

13  only going to play certain excerpts, although it's a good

14  chunk.  I think this is --

15        THE COURT:  That's fine.  You may present whatever

16  you want to present.  It's all in evidence.

17        MR. HOWARD:  But I -- just to be clear, when I talk

18  about excerpts, Officer Ferrero did have -- there was separate

19  video files for his body-worn camera.  This is one of them.  So

20  that's where we're going to (inaudible) play is (inaudible).

21        And if we could play about the first 3 minutes of

22  this.

23     (Video playing.)

24  BY MR. HOWARD:

25  Q.    And can you describe (inaudible) what's happening there?

1    A.    Right now, you have Agent Hood there with myself --

2              MR. HOWARD:   If we could pause it for a second.

3         (Video paused.)

4    BY MR. HOWARD:

5    Q.    And if you -- you mentioned Agent Hood.   Could you --

6    we've now stopped it at the 1-minute, 29-second mark, if you

7    could identify where Agent Hood is and where yourself is, if

8    you can see.

9    A.    Agent Hood is the gentleman in the shorts with the black

10   police vest.   He's standing just behind that -- what looks to

11   be a black SUV.

12   Q.    Towards the middle of the screen?

13   A.    Yes, sir.   Myself is there on the far left.   Looks like --

14   I think I'm wearing a gray shirt, blue jeans, with the green

15   vest.

16   Q.    The house that you're approaching, is that 8 Palm?

17   A.    No, sir.

18   Q.    What house is that?

19   A.    That was 10 Palm Avenue.   At that point, we knew

20   10 Palm Avenue was out of play.   I know we had mentioned

21   earlier we were trying to determine the specificity of the GPS

22   location.   But at that point, we had just merely gone to the

23   wrong residence.   Once we learned that that was 10, we stepped

24   back and went back to 8 Palm.

25   Q.    All right.   And so the location data you're getting, it's

1   not -- we're not talking about 1, 5, 10 meters?  It's a pretty

2   good distance?

3   A.   Right 20 to 30 meters were what we were looking at.

4        MR. HOWARD:   Okay.   Go ahead.

5      (Video playing.)

6   BY MR. HOWARD:

7   Q.   Whose voice do we hear saying, "Somebody just

8   (inaudible)"?

9   A.   That was Officer Ferrero.

10       MR. HOWARD:   If we could pause it there.

11     (Video paused.)

12  BY MR. HOWARD:

13  Q.   Do you see anybody else --

14  A.   Yes.

15  Q.   -- that you recognize?

16  A.   That's Inspector Plumley.

17  Q.   Okay.   Now, you have SWAT training and experience;

18  correct?

19  A.   Yes, sir.

20  Q.   Was this a SWAT operation?

21  A.   No, sir.   This is -- this was a CNT operation, though some

22  of us have SWAT training.   I mean, this was kind of a more

23  fluid, you know, tracking operation through CNT and (inaudible)

24  at this time.

25  Q.   All right.   Were there snipers there?

28

1    A.    No, sir.

2    Q.    If this had been SWAT, would you use what's called a

3    BearCat?

4    A.    Yes, sir.

5    Q.    Okay.   What is that?

6    A.    It's an armored vehicle, allows any police officers there

7    or any, you know, personal there -- personnel there to remain

8    in an armored car basically at a place where they would be safe

9    from any gunfire.

10   Q.    Okay.   Any other differences?   Would you be dressed

11   differently if this was a SWAT operation?

12   A.    Yes, sir.   Any kind of approach like that, we would be

13   required to wear what would be full body armor, helmets, things

14   like that, and be a lot more of us than what -- just the few

15   that we took up there.

16   Q.    Okay.

17         (Video playing.)

18   BY MR. HOWARD:

19   Q.    Who is speaking (inaudible)?

20   A.    That's me.

21         (Video paused.)

22   BY MR. HOWARD:

23   Q.    So we paused it now at the 3:27 mark.

24         Can you tell us what's happened thus far?

25   A.    Yes, sir.   So once we went to the door and announced

1   ourselves asking for Mr. Miller to come out, we didn't see any

2   response elicited from anyone in the house, didn't hear anybody

3   answer, didn't see any window shades, nothing like that.  So

4   what we decided to do was step back into a -- what would be a

5   safer position behind the vehicles.

6        At that point, based on Mr. Miller's history that I was

7   aware of from the investigations, his access to firearms as

8   well as the investigation as well, knowing quite often firearms

9   are in tandem with narcotics, to include him being aware of our

10  efforts to apprehend other persons in the investigation, we

11  started to treat it as what would be a barricaded subject.

12  Q.    In the presence of -- well, were there multiple vehicles

13  at that house?

14  A.    That's correct.  There were multiple vehicles, which made

15  us consider that there would be more than just the normal, you

16  know, small family that you would expect in a house like that.

17  Q.    Okay.

18            MR. HOWARD:  If we could keep playing.

19            (Inaudible.)

20  BY MR. HOWARD:

21  Q.    And does Mr. Miller come out of the house?

22  A.    Yes, sir.

23  Q.    And we heard some conversation there with Mr. Miller.

24        Do you recall if he was asked about other people in the

25  house?

30

1    A.    Yes, sir.

2    Q.    And what was his response?

3    A.    He indicated to me that there were other people in the

4    house.

5          (Video playing.)

6               MR. HOWARD:   If we could just pause it.

7          (Video paused.)

8    BY MR. HOWARD:

9    Q.    Agent Jarriel, we've paused it at the 4-minute, 10-second

10   mark.

11         Can you tell us what's happened thus far?

12   A.    Yes, sir.  So we were able to have the rest of the

13   occupants in the residence step out.  Our concern -- since

14   Mr. Miller didn't give any specificity as to who was in the

15   residence, our concern was Mr. Griffin may be in the residence

16   with him, you know, based off their relationship, how long

17   they've known each other from what we could tell.  We just

18   wanted to be sure that there was no other wanted conspirators,

19   especially ones that had fled the night before, inside the

20   residence.

21   Q.    And are we seeing multiple people come out of the house

22   now?

23   A.    Yes, sir.

24   Q.    Approximately how many?

25   A.    I believe it was six or seven in total.

1    Q.    Did Mr. Hooper come out of that house?

2    A.    Yes, sir.

3    Q.    All right.  And as the individuals come out of the house,

4    where do they go?

5    A.    We had the remaining part of the family -- or persons

6    there in the residence step to what would be our right, and

7    Mr. Hooper, I believe, stepped down to the left with

8    Agent Hood.

9              MR. HOWARD:  If we could (inaudible).

10          (Video playing.)

11             MR. HOWARD:  If we could pause it there.

12          (Video paused.)

13   BY MR. HOWARD:

14   Q.    Did you hear -- or did you speak to a female?

15   A.    Yes, ma'am -- yes, sir.

16   Q.    We've stopped it at the 4-minute, 16-minute mark.

17          Do you recognize the female that you spoke with that day?

18   A.    Yes, sir.  The lady there in the orange shirt was

19   identified as the girlfriend of Mr. Hooper.

20   Q.    Okay.  And did you -- what, if anything, do you recall

21   asking her?

22   A.    Again, we were just kind of expressing our concern that

23   there was -- that -- ensuring there was no one else in the

24   house.  We let her know that Mr. Miller was a wanted fugitive

25   and that's why we were there.  We also expressed concern that

1   there was evidence of -- that Mr. Miller may have brought into

2   her residence.

3           MR. HOWARD:   And if we could start it (inaudible).

4       (Video playing.)

5           MR. HOWARD:   If we could pause it there.

6       (Video paused.)

7   BY MR. HOWARD:

8   Q.    What, if anything, did you ask about the ownership of the

9   home?

10  A.    I know it's faint, but I had asked her if she owns the

11  home.   I believe she told me she was a renter.

12  Q.    Okay.   And we've -- for the record, did this conversation

13  occur around the 4:21 mark on this video?

14  A.    (No audible response.)

15  Q.    I'm sorry.   Was that a yes?

16  A.    Yes.

17  Q.    So she indicated that she was a renter.

18      (Video playing.)

19      (Video paused.)

20  BY MR. HOWARD:

21  Q.    And now pausing it at -- are you able to see so I

22  can . . .

23  A.    4:31, I believe, sir.

24  Q.    What's being discussed during this time?

25  A.    Again, that's where we were kind of asking her if there

1    was anyone else in the residence after asking if she was the

2    owner of the home.

3    Q.   Okay.  Did you advise her that she had a wanted fugitive

4    in her house?

5    A.   Correct.

6    Q.   And was there also discussion about getting any evidence

7    in the house?

8    A.   Correct.

9    Q.   And do you recall what her response was?

10   A.   I'd have to hear it again, sir.

11   Q.   Okay.

12        MR. HOWARD:  If you could play it.

13    (Video playing.)

14        MR. HOWARD:  If you could pause it.

15    (Video paused.)

16   A.   I can hear her say, "Y'all go in there.  I don't care."

17   BY MR. HOWARD:

18   Q.   And when she said, "Y'all go in there, I don't care," what

19   did you understand her -- that she was referring to?

20   A.   To be able to search the residence to make sure there was

21   no other wanted persons in there.

22        THE COURT:  Mr. Howard, can you play that again,

23   please, just that exchange.

24    (Video playing.)

25        MR. HOWARD:  Pause it there.

1          (Video paused.)

2     BY MR. HOWARD:

3     Q.    Did you say -- hear her say, at one point, "my house"?

4     A.    I believe -- I'd have to hear it again, sir.  I'm sorry.

5     Q.    Okay.  But you heard her say, "Y'all go in there.  I don't

6     care"?

7     A.    Correct.

8     Q.    Okay.  And you understood that as she was giving consent

9     to search the house?

10    A.    Yes.

11    Q.    At this -- okay.

12          MR. HOWARD:  And let's keep playing.  If we could

13    play about the next -- we're now at 4:41.  If we could play the

14    next 5 seconds itself.

15          (Video playing.)

16          MR. HOWARD:  (Inaudible.)

17    BY MR. HOWARD:

18    Q.    All right.  Was there -- after she said, "Y'all go in

19    there, I don't care," was there additional conversation with

20    her?

21    A.    Yes.  I felt, at that point, it was just -- I wanted to be

22    sure, ask the question again.

23          And I started off, "Do you mind if we go in there?"

24    Q.    Okay.  And what was her response to that question?

25    A.    It was the same response.  It was fine to go.

1  Q.    Did she say, "Y'all go in there.  I don't care"?

2  A.    I'd have to hear it again.

3  Q.    All right.

4          MR. HOWARD:  We can -- can we back up the last,

5  maybe -- from 4:35.

6      (Video playing.)

7  A.    Yeah.  I answered, "That's fine."

8  BY MR. HOWARD:

9  Q.    Okay.  So when she said, "Y'all go in there.  I don't

10 care," and, "Yeah, sure.  Go ahead," did she place any

11 limitations on her consent?

12 A.    No, sir.

13 Q.    Did she tell you you could only go in certain rooms?

14 A.    No, sir.

15         MR. KUHLMAN:  Your Honor, these are pretty specific

16 leading questions here to a -- an essential issue of the motion

17 and something that does not -- I mean, I'd like the witness to

18 testify to his personal knowledge and not the Government's

19 position on the legal conclusion.

20         MR. HOWARD:  I'm happy to rephrase.

21         THE COURT:  Go ahead and re- -- the objection is

22 overruled, but restate your --

23         MR. HOWARD:  Sure.

24         THE COURT:  -- restate your question.

25                  (No omissions)

1  BY MR. HOWARD:

2  Q.    In fact, I'll rephrase it perhaps better, Agent.

3       What did you understand that she was consenting to?

4  A.    To a search of the residence with no limitations.

5  Q.    And have you done -- executed a number of arrest

6  warrants --

7  A.    Yes, sir.

8  Q.    -- in your career?

9       Have you searched based on individuals' consents numerous

10  times in your career?

11  A.    Yes, sir, verbal consent, written consent, et cetera.

12  Q.    At the time that she is giving this consent to search that

13  residence, had she herself been searched?

14  A.    No, sir.

15  Q.    Was she under arrest?

16  A.    No, sir.

17  Q.    Was she handcuffed?

18  A.    No, sir.

19  Q.    Did she appear cooperative when she was speaking with you?

20  A.    Yes, sir.

21  Q.    Did she appear -- in your interactions with her at the

22  time that she gave that consent, did she appear afraid?

23  A.    No, sir.  I've seen people that have truly been afraid,

24  overwhelmed.  She did not appear that way.

25  Q.    Did you physically coerce her in any way?

1    A.    No, sir.

2    Q.    Did you make any promises or lie to her?

3    A.    No, sir.

4    Q.    Did you tell her that you had authority to enter in the

5    house?

6    A.    No, sir.

7          MR. HOWARD:  If we could keep going.

8        (Video playing.)

9  BY MR. HOWARD:

10   Q.    Do you hear a voice there?

11   A.    Yes.

12   Q.    And whose voice is that?

13   A.    That's Officer Ferrero.

14   Q.    And what's he saying?

15   A.    He's relaying that we were given consent to enter the

16  residence, basically relaying to the agents -- or the assisting

17  officers in the back, make sure there's no miscommunication or

18  anything that there's anybody in there.

19   Q.    Okay.

20         MR. HOWARD:  If we could -- we're now -- we've now

21  stopped at the 4:50 mark.  If we could skip ahead to the

22  5:30 mark.

23       (Video playing.)

24         MR. HOWARD:  If we could pause it there.

25       (Video paused.)

1    BY MR. HOWARD:

2    Q.    Agent, what's happening now?

3    A.    Bringing a few officers who've got a little bit more

4    tactical training up there to assist for us to just do a search

5    of the residence for bodies.  That's what we announced that we

6    were doing to the other officers that were assisting, just

7    going to make sure nobody else was in there, they didn't pose

8    any threats, particularly any of our wanted persons that may

9    still be in there.

10   Q.    When you say a search for bodies, what do you mean?

11   A.    Just to make sure there's no other, you know, persons that

12   are hiding, that are still in the residence that didn't come

13   out after we had asked them to or basically after they had told

14   us there was nobody else in there.

15   Q.    And why were you concerned about other individuals

16   potentially being in the house?

17   A.    Just with the information we had that, you know,

18   Mr. Miller had been around firearms before as well as knowing

19   that Mr. Griffin was on the run and then him being aware of the

20   impending investigation, we just wanted to make sure there was

21   no one else in there.

22   Q.    And in the course of this investigation, was there a close

23   relationship between Omar Griffin and Barrington Miller?

24   A.    That's correct.

25   Q.    And at this time, Omar Griffin had stolen a car and fled;

1    correct?

2    A.    Correct.

3              MR. HOWARD:   All right.   If we could continue.

4         (Video playing.)

5    BY MR. HOWARD:

6    Q.    And who -- do you recall who specifically you went in

7    there with?

8    A.    That looks like myself, Officer David Green -- I believe

9    that's first name -- Officer Moustafa.   And I think that was

10   McKoon -- Officer McKoon that was joining us as well.

11   Q.    Okay.   And are you able to indicate where

12   Officer McKoon --

13   A.    He's the gentleman that's walking up to the stairs just

14   past where Mr. Miller -- got the black vest with the white

15   writing on it.

16   Q.    Okay.   Towards the middle right of the screen?

17   A.    Yes, sir.

18   Q.    Okay.

19        (Video playing.)

20   BY MR. HOWARD:

21   Q.    All right.   And so you went in there at approximately the

22   5:40 mark; correct?

23   A.    Yes, sir.

24             MR. HOWARD:   Okay.   If we could stop that, and if we

25   could move ahead to -- up to the 7:10 mark.

40

1    BY MR. HOWARD:

2    Q.    Now we've moved ahead about a minute and 30 seconds.

3          (Video playing.)

4    BY MR. HOWARD:

5    Q.    And let me know if you see yourself come out.

6    A.    Yes.  That appears to be the four-person team that we had

7    come in there and come out.

8    Q.    So how long did this -- is it fair to describe this as a

9    protective sweep?

10   A.    Correct.  It wasn't intrusive as far as the search goes.

11   It was just a protective sweep to ensure there was no other

12   persons in there at the time.

13   Q.    How long are we talking about?

14   A.    Approximately 2 minutes.  And the reason being

15   2 minutes -- this isn't like you would see, you know, any kind

16   of dynamic entry.  This is somewhat slow and deliberate.  We

17   were checking corners, behind doors, anywhere a person could

18   hide at this point, and that's what we were doing.

19   Q.    Okay.  So what happened when you went in there for that

20   protective sweep?

21   A.    Didn't see anybody in there, came out.

22   Q.    Okay.  So you're going in there looking for persons;

23   correct?

24   A.    Correct.

25   Q.    Did you find any people in there?

1   A.    No, sir.

2   Q.    Did you find any drugs?

3   A.    No, sir.

4   Q.    Any guns?

5   A.    Nothing evidentiary that caught my eye at the time.

6   Q.    Did you -- were you aware of anybody else buying drugs or

7   guns during this protective sweep?

8   A.    No, sir, not that I'm aware of, and nobody indicated to me

9   that was the case at that point.

10  Q.    Okay.  When you went in there to do -- in that first, kind

11  of, entry, where was Vincent Hooper at the time?

12  A.    Outside there still with Agent Hood.

13  Q.    Okay.  Did Vincent Hooper say anything to you or object in

14  any way to your entry?

15  A.    Not to me, no, sir.

16  Q.    Are you aware if he said -- or objected in any way to

17  anybody else?

18  A.    No one else indicated me -- to me that there was any type

19  of objection by Mr. Hooper or anyone else there.

20          MR. HOWARD:  All right.  If we could go to the

21  8-minute mark.

22      (Video playing.)

23          MR. HOWARD:  And if we could pause it there.

24      (Video paused.)

25                      (No omissions)

1    BY MR. HOWARD:

2    Q.   So we've now stopped at the 8:12 mark.

3         Do you see yourself on the screen?

4    A.   I believe I'm on the porch.

5    Q.   And what are you doing?

6    A.   Standing still outside of the residence at that point.

7    Q.   And were you walking into the house?

8    A.   Yes.

9    Q.   Okay.  And who were you walking into the house with?

10   A.   Agent Hood and, I believe, Inspector Plumley with

11   Mr. Hooper.

12   Q.   Okay.  And we'll watch it, but why are you going into the

13   house now?

14   A.   At that point, we wanted to talk with Mr. Hooper briefly,

15   but we wanted to do it away from Mr. Miller and -- just

16   bringing a more comfortable setting there inside the residence.

17   Q.   Okay.  So do you go inside the house with Mr. Hooper?

18   A.   Yes.

19   Q.   And did he seem cooperative?

20   A.   Yes, from what I could tell.

21   Q.   And after you go inside with Mr. Hooper, what happens?

22   A.   He had indicated -- Agent Hood had indicated to me that

23   Mr. Hooper relayed to him that there was items that Mr. Miller

24   had brought into the residence, specifically Mr. Hooper's room.

25        He walked us back to where his room was and showed us a

1    safe that was back there, unlocked the safe.

2            And as he did, I kind of whoa'd him because I didn't know

3    what exactly was in there.  I knew it was a gun safe but, you

4    know, didn't know what all was in there.  It was cracked open,

5    and I could tell what would -- you know, what we thought was

6    evidentiary items were in there.  And that's when we stopped

7    and then returned to the living room.

8            MR. HOWARD:  Okay.  So let's play from -- till about

9    8:25.

10           (Video playing.)

11   BY MR. HOWARD:

12   Q.   Now, stopping at 8:25, earlier, you said Inspector Plumley

13   went in there with you.

14           Having reviewed the video, did Inspector Plumley go in

15   there with you?

16   A.   I guess he didn't.  I knew he was in there at some point.

17   I'm not sure exactly when he entered the residence.

18   Q.   And do you see Inspector Plumley on the video here?

19   A.   Yes.

20   Q.   All right.  So, to your recollection, who went in there

21   with Mr. Hooper?

22   A.   It would have been Agent Hood and I.  I know that for

23   certain.

24   Q.   So you go in there.  He opens -- he opens the safe.  You

25   see the evidentiary value.  And you said you took him -- or he

44

1    went somewhere.

2          Where did he go?

3    A.    Back to the living room.

4    Q.    Okay.  And why did he go there?

5    A.    At that point, we wanted to separate him from any, you

6    know, evidentiary items to include firearms, anything that

7    could be destroyed or, you know, possibly used to harbor an

8    escape if he considered it.

9    Q.    Okay.  And when you are going with Mr. Hooper back into

10   that room, is he telling you where to go?

11   A.    No, sir.

12   Q.    Is he kind of directing or showing you where to go?

13   A.    I'm sorry.  Do you mean his bedroom?

14   Q.    Yes.

15   A.    Yes.  It was -- I didn't know at that point which bedroom

16   was his.  It was him having to show us where that was.

17   Q.    And can you describe how to get to his bedroom from

18   outside of the house.

19   A.    So if you're to walk in the front door, there's a living

20   room, opens up to a long hallway to the right.  There was three

21   bedrooms, I believe.  Mr. Hooper's bedroom would have been down

22   at the end of the hallway on the left.

23   Q.    At any time when you're in the bedroom or when he's

24   directing you back to the bedroom, did he object in any way to

25   the search?

1    A.    No, sir.

2    Q.    Did he seem cooperative?

3    A.    Yes, sir.

4    Q.    Was he handcuffed?

5    A.    No, sir.

6    Q.    Were there guns pointed at him?

7    A.    No, sir.

8    Q.    Were you yelling at him?

9    A.    No, sir.

10   Q.    Threatening?

11   A.    No, sir.

12   Q.    Lie to him?

13   A.    No, sir.

14        MR. HOWARD:   If we could skip ahead now to the

15   10:50 mark.

16   BY MR. HOWARD:

17   Q.    And real quick, so we go -- we were looking at about the

18   8.5-minute mark, skipping ahead to the 10:55 mark.

19        (Inaudible), do you recall how long you were in there

20   until you came out?

21   A.    It was a matter of a few minutes.  It was very

22   short-lived.

23        MR. HOWARD:   Could we skip ahead to (inaudible).

24        (Video playing.)

25        MR. HOWARD:   (Inaudible) pause it there.

1          (Video paused.)

2     BY MR. HOWARD:

3     Q.    And do you see anybody leaving the house?

4     A.    Yes.  That's myself and what looks to be Agent Hood,

5     Agent --

6     Q.    And we're --

7     A.    -- Hood coming out first.

8     Q.    And we're up to 11:07 at that part of the video as guys

9     come out of the house?

10    A.    Yes, sir.

11          MR. HOWARD:  And if we could skip ahead to the 11:40

12    mark.

13          (Video playing.)

14          MR. HOWARD:  If we could pause it here.

15          (Video paused.)

16    BY MR. HOWARD:

17    Q.    So we've now paused it at the 11:47 mark.

18          Can you describe what's depicted there?

19    A.    Yes.  That's Agent McKoon and Mr. Hooper there sitting on

20    his couch in the living room.

21    Q.    Okay.  And can you describe, looking at that specific

22    screen, where Mr. Hooper is?

23    A.    If you see Agent McKoon, I guess what would be down to our

24    left side, his right side, right there on what was some type of

25    love seat or couch is where Mr. Hooper was sitting.

1    Q.    Okay.   And is Agent McKoon's firearm pointed at

2    Mr. Hooper?

3    A.    No, sir.

4    Q.    All right.   So you -- by this time, you were out of the

5    house with Agent Hood; correct?

6    A.    Yes.

7    Q.    Do you recall why you left the house?

8    A.    We were going to obtain a consent to search form is

9    what -- our reason for walking outside.   Unfortunately, we

10   didn't have any of ours with us, so we had to go borrow one

11   from the Savannah Police Department.

12            MR. HOWARD:   If we could play it.

13         (Video playing.)

14   BY MR. HOWARD:

15   Q.    And at that time that -- well, did you come to learn who

16   that woman was who claims to be the renter of the house, her

17   name?

18   A.    I don't recall.

19   Q.    Okay.   At any time, did she withdraw that consent?

20   A.    No, sir.

21   Q.    And what's happening here?

22   A.    Agent Hood and I had dropped some of our equipment -- or

23   put it in our vehicles, went to get the consent form, and that

24   was Officer Ferrero helping us out by giving us one of his

25   consent forms.

1   Q.   Did you understand at this time that you had consent to
2   search from Mr. Hooper as well?
3   A.   I knew it was a work in progress.  I know we were going to
4   wait to, you know, call that consent certain once we had the
5   form --
6   Q.   Okay.
7   A.   -- the consent form signed.  I'm sorry.
8   Q.   Right.  But had Mr. Hooper objected in any way to a
9   search?
10  A.   No, sir.  He was cooperative.
11  Q.   Okay.  And --
12          MR. HOWARD:   (Inaudible.)
13       (Video playing.)
14  BY MR. HOWARD:
15  Q.   And so what's happening now?
16  A.   Myself and Agent Hood are returning back towards the
17  house.  I stop and speak with Mr. Miller, and I think
18  Agent Hood continued into the residence.
19  Q.   And are you now walking into the house?
20  A.   Correct.
21  Q.   And did you go into that house?
22  A.   Yes.
23  Q.   And did Mr. Hooper sign a consent form?
24  A.   Yes.
25  Q.   Looking at Exhibit L, do you recognize that?

1   A.   Yes, sir.

2   Q.   Do you recognize that?

3   A.   I do.

4   Q.   What is that?

5   A.   That is the consent to search form that was given to us

6   by Officer Ferrero signed by my -- myself, Mr. Hooper, and

7   Agent McKoon.

8   Q.   And after Mr. Hooper signed the consent form, did you go

9   back and collect the evidence from his room?

10  A.   Yes.

11  Q.   Then turn to Exhibit K, and I'll ask if you recognize

12  that.

13  A.   Yes, sir.  It's photographs.

14  Q.   And what are they photographs of?

15  A.   Photographs of evidentiary items, what appears to be found

16  inside the safe.

17  Q.   In plain English, when you say "evidentiary" --

18  A.   Oh, heat-sealed bags of marijuana, firearms -- multiple

19  firearms there inside the safe.

20  Q.   And inside what safe?

21  A.   The safe that was inside Mr. Hooper's room.

22  Q.   Okay.  And he opened that safe?

23  A.   That's correct.

24  Q.   At the time that he opened that safe, any guns pointed at

25  him?

1   A.    No, sir.

2   Q.    Threatening him?

3   A.    No, sir.

4   Q.    Was he acting cooperative?

5   A.    Yes.

6   Q.    And based on your observations, did he appear to be acting

7   voluntarily?

8   A.    Yes, sir.

9         MR. HOWARD:  I have no further questions of this

10  witness, Your Honor.

11        THE COURT:  Mr. Kuhlman, any cross?

12        MR. KUHLMAN:  Just a few, Your Honor.  Thank you.

13                        CROSS-EXAMINATION

14  BY MR. KUHLMAN:

15  Q.    Good afternoon, Agent Jarriel.

16  A.    Good afternoon, sir.

17  Q.    My name is Cameron Kuhlman.  Turning to -- just as a first

18  item, you were just telling us about the consent forms.

19        Mr. Howard showed you Government's Exhibit L; correct?

20  A.    Yes, sir.

21  Q.    That's not the actual consent form; correct?

22  A.    No.  It's a photograph of it, sir.

23  Q.    I'm sorry?

24  A.    Photograph of it.

25  Q.    Right.  It's a photograph of it.

1    A.    Yes, sir.

2    Q.    And does that photograph depict the -- accurately depict

3    the size in terms of, like, a -- you know, on a cereal box, we

4    see that it's not an actual size.   The cereal is enlarged.

5          Is this photograph an actual size of the consent form?

6    A.    I think the consent form is a little bit smaller.

7    Q.    Can you just demonstrate for us, sort of with your hand,

8    what size you think the consent form is.

9    A.    Probably about that size, I think.   We don't use the

10   Savannah PD ones very often.   Officer Ferrero may have better

11   insight as far as to the actual size of them.

12   Q.    Okay.   Turning back to the call log and the poll cam log

13   that Mr. Howard asked you about, you would agree with me that

14   there are 18 calls -- I think that was your testimony

15   earlier -- there's 18 calls identified in the call log;

16   correct?

17   A.    Yes, sir, some of them being answered, some unanswered.

18   Q.    Okay.   But the majority of those calls are marked as not

19   pertinent; correct?

20   A.    Correct.

21   Q.    Okay.   And as far as the pole cam pages, the vast majority

22   of this poll cam activity does not involve Mr. Hooper; correct?

23   A.    Correct.

24   Q.    And, in fact, there are a couple of the seven instances

25   that you identified Mr. Hooper at Mr. Miller's house that

1  correspond to not pertinent phone calls?

2  A.    Correct.  Yes, sir.

3  Q.    Regarding the phone call that Mr. Howard asked you about

4  between Mr. Swinton and Mr. Miller, there's no mention in that

5  phone call of Mr. Hooper participating in the cleanup that

6  Mr. Howard alluded to; correct?

7  A.    Correct, sir.

8  Q.    And you testified that after you had that phone call and

9  several other things, you obtained an arrest warrant for

10  Mr. Miller on the night of -- I think it's March the 5th or

11  6th; is that correct?

12  A.    Yes, sir.  I didn't -- I wasn't the affiant on the arrest

13  warrant, but we had a cooperating agent help us out.

14  Q.    A member of your investigative team --

15  A.    Yes, sir.

16  Q.    -- obtained the warrant; right?

17  A.    Yes, sir.

18  Q.    But you did not obtain an arrest warrant for Mr. Hooper at

19  that time?

20  A.    No, sir.

21  Q.    And you did not obtain a search warrant for Mr. Hooper at

22  that -- Mr. Hooper's residence at that time either; correct?

23  A.    Correct, correct.

24  Q.    No search warrant?

25  A.    No search warrant, no, sir.

53

1   Q.    You testified that, at the time of this arrest or at the

2   time of this search, you were detailed to CNT.

3         CNT was not your employer; correct?

4   A.    It's -- my employer is the City of Savannah as a police

5   officer, and then I'm tasked out to CNT as a drug agent.

6   Q.    So as an employee of Savannah Police Department, are you

7   subject to the Savannah Police Department policies and

8   procedures in addition to the CNT policies and procedures?

9   A.    Yes, sir.

10  Q.    Okay.  So you're aware that Savannah Police Department has

11  a policy that all agents should attend -- excuse me -- in

12  effect at the time that all agents or officers should wear body

13  cams where available; correct?

14  A.    The way I understand it, it's for uniform duty as well as

15  detectives.  So there's other entities within the Savannah

16  Police Department operating in a plain clothes capacity that do

17  not wear body cameras.  So there are, from what I understand,

18  not anybody that's exempt from it, but there's instances where

19  they don't wear them specifically in undercover drug, you know,

20  capacities or -- excuse me -- undercover and plain clothes

21  capacities of investigations.

22  Q.    Okay.  Can -- you testified that there was a -- that,

23  at some point during the attempt to arrest Mr. Miller, you

24  switched the situation into a, quote, barricaded subject

25  scenario; correct?

1   A.    Yes, sir.

2   Q.    Does the barricaded subject create additional threat to

3   officers, or what is the difference between a barricaded

4   subject situation and just executing an arrest warrant?

5   A.    So considering -- we always like to consider histories,

6   what information is known to us beforehand.   And if I may

7   mention, the -- being a drug investigation, how Mr. Miller was

8   aware of law enforcement's enforcement actions to effect arrest

9   on conspirators, as well as his interaction with firearms from

10  previous law enforcement investigations, after there was no

11  response elicited by our knocking and announcing ourselves,

12  with everything that we knew, that's when we started to back up

13  and treat the situation as a barricaded gunman.   And

14  fortunately for everyone, Mr. Miller just, you know, came out

15  after that.

16  Q.    Right.   But you would agree with me that there's a

17  difference between the way in which you approached execution of

18  this search warrant and the way in which, maybe, a sheriff's

19  deputy might just go knock on the door and say, "Here's a

20  warrant.   We're here to arrest you"; correct?

21  A.    Correct.

22  Q.    There were additional firearms involved that wouldn't

23  necessarily involve (inaudible) necessarily a side arm of just

24  a single deputy approaching the door of a residence?

25  A.    Correct.   Based on our insight, we used certain tools to

1    be able to approach the residence in what we thought was a safe

2    manner.

3    Q.    When did you identify Mr. Hooper as a target of your

4    investigation?

5    A.    We knew he was a person that was intercepted.  We knew he

6    was a person that was facilitating Mr. Miller's requests

7    though -- even though -- who was keeping the dogs fed and

8    quiet.  There was a reason and purpose behind that.

9         That -- we knew Mr. Hooper's assistance with that, you

10    know, would help not have law enforcement come over there so

11    much.  Basically, the dog catcher as well as the police kept

12    getting called to Mr. Miller's house because of the problems

13    his dogs were having.

14         So Mr. Miller would elicit the help of Mr. Hooper as well

15    as a gentleman, Michael Jones, across the street to basically

16    keep the dogs fed, keep them quiet from barking, and keep

17    them -- you know, keep them walked.

18    Q.    I appreciate the description of all the circumstances.

19    Thank you.  Maybe I asked a bad question.

20         My question was simply:  When did Mr. Hooper become a

21    target of the investigation?

22    A.    When he was intercepted.  I guess it's how you want to

23    define "target."  You know, he was an interceptee, but, at that

24    point, we didn't deem him as a high-priority target or

25    conspirator at any point.

56

1   Q.    Can you put a date on it?

2   A.    Let's see.  It was prior to the first affidavit that was

3   signed, so it was early January because we knew Mr. Miller and

4   Mr. Hooper had interactions.  They were stopped in a car

5   together at one point.  I think Mr. Hooper was driving.  And

6   this was just a ticket that Mr. Hooper, I believe, received

7   while he was -- Mr. Miller was a passenger in the vehicle.

8   Q.    When you were testifying earlier about what -- we were

9   watching the tapes -- the body cam from Officer Ferrero, you

10  were testifying as to what you could hear on the tape; correct?

11  A.    Correct.

12  Q.    Okay.  And you testified that you had asked at one point

13  for some officers with some additional tactical training to

14  come in.

15        If you -- can you tell me the percentage of officers or

16  agents on the scene at this arrest that had, quote, tactical

17  training as compared to just uniformed street patrol officers?

18  A.    Specifically, the two officers that went in there with me

19  were -- are on the SWAT team, Officer Moustafa and then

20  Officer Green, who's since left the police department.  Myself

21  and Agent McKoon has had, you know, additional tactical

22  training for being at CNT that was for doing entries into

23  residences, extracting any kind of wanted person out of houses,

24  things of that sort.

25  Q.    Officer Garcia?

1  A.    No, sir.

2  Q.    Okay.

3  A.    Green.  I'm sorry.  You may have misunderstood me.

4  Q.    So you're testifying about Officer -- an Officer Green

5  who's recently left the police department, not an

6  Officer Garcia?

7  A.    No, sir.

8  Q.    Okay.  Mr. Howard asked you a question about who went into

9  the house during -- to go back to the safe.  We were watching

10  the video, and you had some trouble recalling whether or not

11  Mr. -- or Officer Hood -- or Agent Hood went in with you;

12  right?

13  A.    Right.  I knew Agent Hood and I were the ones that went

14  back with Mr. Hooper initially to the room where he directed

15  us, where his room was and the items of concern.  I think I may

16  have misspoke.  I knew Officer Plumley was eventually going to

17  be in the residence or was.  Now, when he exactly went in, I

18  wasn't sure.  I don't think I was clear on that.

19  Q.    Right.  But you're not clear about who was in there, but

20  you're certain there were no lies told, and you're certain

21  there were no guns pointed; correct?

22  A.    Correct.

23          MR. KUHLMAN:  No further questions.

24          THE COURT:  Any redirect, Mr. Howard?

25          MR. HOWARD:  Yes, Your Honor.

1    REDIRECT EXAMINATION

2  BY MR. HOWARD:

3  Q.    There were questions about the size of the consent form.

4        Was that a consent form that you could read and

5  understood -- understand?

6  A.    Yes, sir.  From what -- my recollection, it's all in bold

7  typed writing.

8  Q.    Capital letters?

9  A.    Yes, sir.

10  Q.    The original, is this small font that's difficult to read?

11  A.    In my opinion, it's not difficult to read, no.

12  Q.    And did Mr. Hooper express any inability to read or

13  understand that consent form?

14  A.    Not that I'm aware of.

15  Q.    You were also asked about whether you're testifying based

16  on what -- on the video itself, but you also have personal

17  experience with this; correct?

18  A.    Yes.

19  Q.    Do you remember this evening?

20  A.    Yes.

21  Q.    Do you remember the events?

22  A.    Yes.

23            MR. HOWARD:  I have no further questions.

24            THE COURT:  Mr. Kuhlman, anything else?

25            MR. KUHLMAN:  Nothing further.

1          THE COURT:   All right.   Mr. Jarriel, you can step
2    down.
3          THE WITNESS:   Thank you, Your Honor.
4          THE COURT:   Call your next witness.
5          MR. HOWARD:   The Government calls Agent Joseph Hood.
6       (Joseph Hood entered the courtroom.)
7          COURT CLERK:   Sir, you've previously been sworn.
8    Please be seated.
9          State your name and your occupation for the record,
10   please.
11         THE WITNESS:   My name is Agent Joseph Hood.   I work
12   for the Chatham-Savannah Counter Narcotics Team assigned there
13   from the Savannah Police Department.
14                          JOSEPH HOOD,
15   having been previously sworn, was examined and testified as
16   follows:
17                       DIRECT EXAMINATION
18   BY MR. HOWARD:
19   Q.   How long have you been with CNT?
20   A.   About -- coming up on 2 and a half years now.
21   Q.   And what did you do before CNT?
22   A.   I was at Savannah PD on the drug -- street-level narcotics
23   unit there.
24   Q.   How long were you with Savannah PD?
25   A.   I've been with Savannah PD for about 7 years now.

1  Q.    And on March 7, 2018, did you assist in executing an

2  arrest warrant for Barrington Miller?

3  A.    I did, sir.

4  Q.    And did you eventually go to 8 Palm Avenue to execute that

5  warrant with several other officers?

6  A.    Yes, sir.

7  Q.    Did Barrington Miller come out of the house?

8  A.    He did, sir.

9  Q.    After Mr. Miller came out of the house, did others as

10  well?

11  A.    Yes, sir.

12  Q.    And did Vincent Hooper come out of the house?

13  A.    He did.

14  Q.    And then after Mr. Hooper came out of the house, what

15  happened next?

16  A.    At that time, there were other wanted co-conspirators

17  that we were looking for that were closely associated with

18  Mr. Miller, and a protective sweep of the house was done.

19  While that was happening, I stood with Mr. Hooper.

20  Q.    Okay.  And when Mr. Hooper came out of the house, where

21  did he go?

22  A.    Initially, just to the left of the door.  I advised him

23  I was going to give him a quick pat for weapons.  So I gave him

24  a quick pat-down, and then we walked down the stairs and walked

25  just in front of the house.

1    Q.    Okay.  And why did you give him a pat down for weapons?

2    A.    Because of the presence of weapons on a lot of the

3    codefendants in this case and it being a drug case and closely

4    tied with weapons.

5    Q.    And you then stood next to Mr. Hooper?

6    A.    Yes, sir.

7    Q.    And while you were standing next to Mr. Hooper, where is

8    your gun?

9    A.    It was -- I had a rifle.  It was slung around my neck and

10   just hanging free.

11   Q.    And was it pointed at Mr. Hooper?

12   A.    No, sir.

13   Q.    Did you handcuff Mr. Hooper?

14   A.    No, sir.

15   Q.    Did you yell at Mr. Hooper?

16   A.    No, sir.

17   Q.    And you mentioned that there was a protective sweep that

18   was done.

19         Were you involved -- did you take part in that protective

20   sweep?

21   A.    No, sir.  I was standing with Mr. Hooper.

22   Q.    And so while there is that protective sweep going on,

23   you're standing with Mr. Hooper; correct?

24   A.    Yes, sir.

25   Q.    Did you have a conversation with Mr. Hooper?

1    A.    I did.  He was standing with his hands up in the air, and

2    I told him to relax because I had already checked him for

3    weapons.  So while I was standing there with him, I had asked

4    him if Mr. Miller had left anything inside, if he'd brought

5    anything to the residence.

6    Q.    And when -- after you asked him that, what did he say?

7    A.    He said, "Yes."

8          I said, "Is it anything illegal?"

9          He said, "Yes."  And he replied -- I think he said, "Guns

10   and marijuana."

11   Q.    Okay.  Did he identify who the guns and marijuana belonged

12   to?

13   A.    He said they were Mr. Miller's.

14   Q.    And after Mr. Hooper told you about the guns and the

15   marijuana, did you ask him for consent to enter the home to get

16   them?

17   A.    I did, sir.

18   Q.    And did you ask him to show you where the items were?

19   A.    Yes, sir.

20   Q.    And what was his response to that?

21   A.    He said he would show us where they were, sir.

22   Q.    You mentioned that he wasn't handcuffed.

23         Was he under arrest?

24   A.    No, sir.

25   Q.    Did you lie to him and tell him that you had a warrant for

63

1    his arrest?

2    A.    No, sir.

3    Q.    Did you lie to him and tell him you had a warrant to

4    search his house?

5    A.    No, sir.  I told him we were there for Mr. Miller.

6    Q.    And after he had given you that consent, said that he

7    would go in and show you where the guns and marijuana were, did

8    you go into the house with Mr. Hooper?

9    A.    Yes, sir, myself and Agent Jarriel.  He escorted us in.

10   Q.    And when you went into that house, what happened?

11   A.    We walked through the living room, took a right down a

12   hallway.  There was a bedroom on the back left, and he showed

13   us a large safe that was in that room.  He said that they --

14   that the guns and marijuana were in the safe.

15   Q.    And who unlocked that safe?

16   A.    Mr. Hooper.

17   Q.    Can you -- was he cooperative?

18   A.    Yes, sir.

19   Q.    At the time you're walking him back there, can you

20   describe, you know, how you and Agent Jarriel are behaving?

21   A.    I think Agent Jarriel walked ahead of him.  And he was

22   following him, and I walked behind Mr. Hooper, but he was

23   cooperative.

24   Q.    Were you yelling at him?

25   A.    No, sir.

64

1    Q.    Any guns drawn at him?

2    A.    No, sir.

3    Q.    Any lies or false promises you made to him?

4    A.    No, sir.

5    Q.    So he opened -- he, I guess, provided the combination for

6    that safe and opened it; correct?

7    A.    Yes, sir.

8    Q.    Could you see what was in that safe?

9    A.    Yes, sir.  There was a large stack of marijuana in

10   heat-sealed bags and multiple firearms.

11   Q.    And based on your training and experience, what did you

12   suspect was contained in those heat-sealed bags?

13   A.    Well, it -- marijuana.

14   Q.    So after you see the guns and the marijuana in the safe,

15   what happens next?

16   A.    Mr. Hooper -- I believe, we then took him to another part

17   of the house, to the living room.  We asked him if we could

18   search the entire room other than the safe as well, and he gave

19   consent.  But at that point, I went to get a written consent

20   form, and I believe he was sitting with Agent McKoon and

21   Inspector Plumley.

22          MR. HOWARD:  Okay.  If we could look at Exhibit J.

23   If we could skip ahead to the 11-minute, 40-second mark.

24       (Video playing.)

25          MR. HOWARD:  If you could pause it right there.

1    (Video paused.)

2    BY MR. HOWARD:

3    Q.    Do you see Mr. Hooper where it's been paused at 11:47 on

4    Exhibit J?

5    A.    Yes, sir.

6    Q.    And where is he?

7    A.    On the couch.

8    Q.    Okay.  And do you see Agent McKoon there as well?

9    A.    Yes, sir, standing.

10   Q.    Do you see Inspector Plumley in there at that time?

11   A.    I don't see him there.

12   Q.    Okay.  And why was Mr. Hooper, then, in that living room?

13   A.    With the presence of firearms throughout the room and

14   potential drug evidence, we had moved into another room.

15   Q.    Okay.  Earlier when you were out there and for the initial

16   entry and the protective sweep, did Mr. -- you were standing

17   right by the front door of that house; correct?

18   A.    Correct.

19   Q.    Did Mr. Hooper object to the entry at all?

20   A.    No, sir.

21   Q.    At any time during your interactions with him -- was he

22   cooperative the whole time?

23   A.    He was -- the entire time, yes, sir.

24   Q.    Did he object in any way to any search?

25   A.    No, sir.

66

1    Q.    Did he appear afraid?

2    A.    No, sir.

3    Q.    Okay.  And you mentioned you went to get a consent form.

4          Did you ultimately get a consent form?

5    A.    Yes, sir.  I believe I got a consent form from

6    Officer Ferrero, the K-9 officer on the scene.

7    Q.    And then after you got that consent form, what did you do?

8    A.    I brought it to Agent McKoon, and I believe Plumley was

9    present.

10   Q.    Okay.  And did Mr. Hooper sign that consent form?

11   A.    Yes, sir.

12   Q.    And did you sign it as witnessing him signing that consent

13   form?

14   A.    Yes, sir.

15   Q.    And if you'd turn to Exhibit L in front of you.

16         And to speed things up, you're -- you've seen the consent

17   form before?

18   A.    Yes, sir.

19   Q.    You got it from Officer Ferrero.

20         Is that a Savannah Police Department consent form?

21   A.    It was, yes, sir.

22   Q.    Is it readable and understandable --

23   A.    Yes, sir.

24   Q.    -- or is it in super small font that you can't read?

25   A.    No, sir.  It's clearly printed.

1   Q.    Now, after you get the consent form, what do you do next?

2   A.    At that point, I believe it was either Agent McKoon or

3   Inspector Plumley that went over it and had him sign it -- or

4   he agreed to sign it.  And they stayed with him, conducted that

5   interview while we -- myself and Agent Jarriel finished

6   searching the room.

7   Q.    Okay.  In that bedroom where Vincent Hooper had showed you

8   where those --

9   A.    Correct.

10  Q.    -- guns and marijuana were?

11         MR. HOWARD:  I have no further questions of this

12  witness, Your Honor.

13         THE COURT:  All right.

14         MR. KUHLMAN:  Just a few, Your Honor.

15                       CROSS-EXAMINATION

16  BY MR. KUHLMAN:

17  Q.    Good afternoon, Agent Hood.

18  A.    Good afternoon, sir.

19  Q.    My name is Cameron Kuhlman.

20         Mr. Howard was just asking you about the consent form.

21  You said you've seen it before.  He asked you some -- about the

22  particulars.

23         If you would --

24         MR. KUHLMAN:  Your Honor, may I approach the witness?

25         THE COURT:  You may.

1   BY MR. KUHLMAN:

2   Q.   I'm going to give you a lined piece of paper, and I'm

3   going to let you borrow my pen.  And if you could, just give

4   me a -- sort of your idea of the size of that consent form, if

5   you could just draw it for me.  You don't have to write the

6   language.  Just draw for me what you recall to be the size of

7   the form.

8   A.   And it's printed on a standard sheet of paper.

9   Q.   So it's your testimony that the form is an 8-and -- is a

10  full 8-and-a-half-by-11 sheet of paper?

11  A.   As far as I can remember.  That's generally -- it's

12  either -- there's that form, and then there's one that maybe is

13  a half size of that.  I don't remember the exact size of the

14  form that we used that night.

15  Q.   Well, you're welcome to review the -- Mr. Howard has shown

16  you the exhibit.  If you want to review that, that might

17  refresh your memory as to which of the forms you used.

18  A.   Let's see if I can find it there.  Okay.  Yes, sir.

19  Q.   Okay.  Does that refresh your memory as to whether or not

20  that -- the form that y'all obtained this consent from

21  Mr. Hooper was, in fact, a half sheet or a full sheet of paper?

22  A.   Not really, sir.  I'll be honest.  I believe it's printed

23  on a full-size sheet of paper.

24  Q.   Okay.  You're detailed to CNT; correct?

25  A.   Correct.

1   Q.    As a part -- at the time of this incident, you were

2   detailed to CNT?

3   A.    Yes, sir.

4   Q.    But are you an employee of Chatham County, or are you an

5   employee of Savannah Police Department?

6   A.    Savannah Police Department.

7   Q.    Okay.  And were you wearing a body cam at -- on this

8   night?

9   A.    No, sir.

10  Q.    Were you aware that other officers, including

11  Officer Ferrero from SPD, were wearing body cams?

12  A.    Yes, sir.

13  Q.    Can you tell me how many body cams there were on this

14  night?

15  A.    I cannot.  Multiple.  I don't --

16  Q.    Okay.

17  A.    I'm not sure.

18  Q.    But you would agree with me there's no body cam footage of

19  you-all walking back and opening the safe with Mr. Hooper?

20  A.    Not that I'm familiar with, no, sir.

21  Q.    Okay.  Is Officer -- or -- excuse me -- Agent McKoon also

22  a CNT agent?

23  A.    He is.

24  Q.    Okay.  And are y'all on the same rank, or do you have a

25  different rank?

70

1   A.    Same rank, sir.

2   Q.    Okay.

3           MR. KUHLMAN:  Bear with me just one moment.

4           THE COURT:  Of course, Mr. Kuhlman.

5   BY MR. KUHLMAN:

6   Q.    Agent Hood, I'm going to show you what we've premarked as

7   Defendant's Exhibit 5, ask you if you can --

8           THE COURT:  You can approach.

9           MR. KUHLMAN:  I'm sorry.

10          THE COURT:  That's all right.  Go right ahead.

11  BY MR. KUHLMAN:

12  Q.    -- if you recognize that document.

13  A.    Yes, sir.  This should be my report for this incident.

14  Q.    Okay.  And I'm specifically asking you about Page 1.

15        You recognize this as an e-mail sent from you forwarding

16  an e-mail received by you from Agent McKoon?

17  A.    Yes, sir.

18          MR. KUHLMAN:  Your Honor, I move to admit Defendant's

19  Exhibit 5.

20          THE COURT:  Can I see Exhibit 5?

21          MR. KUHLMAN:  You may.

22          MR. HOWARD:  No objection from the Government.

23          THE COURT:  Just give it to Sherri.

24          Exhibit 5 is admitted without objection.

25          MR. KUHLMAN:  Thank you, Your Honor.

1  BY MR. KUHLMAN:

2  Q.    Agent Hood, if you'll look at the exhibit there in front

3  of you, can you tell me the date that you received that e-mail

4  and its attachment from Agent McKoon?

5  A.    October 18th, 2018.

6  Q.    Okay.  And then if you'll flip back, that's the

7  attachment; correct?

8  A.    Correct.

9  Q.    And you said -- I think you testified just a moment ago

10 that's your report?

11 A.    Yes, sir.

12 Q.    Can you explain to me why you were receiving your report

13 in an e-mail from Agent McKoon?

14 A.    Yes, sir.  I was out at a meeting with Attorney Howard

15 that day and didn't have a copy of my report there.

16 Agent McKoon was still back at the office, so he e-mailed me a

17 text copy of the report.

18 Q.    And that's on October the 18th --

19 A.    I believe so, yes.

20 Q.    -- of this year?

21 A.    Last year.

22         MR. KUHLMAN:  Your Honor, may I approach?

23         THE COURT:  You may.

24 BY MR. KUHLMAN:

25 Q.    I'm going to show you what we've marked as Defendant's

1   Exhibit Number 6, ask you if you recognize that.

2   A.    Yes, sir.  It should be the same --

3   Q.    You do recognize that?

4   A.    Yes, sir.  It appears to be the same report.

5   Q.    Okay.  But that report is not identical to the one that

6   I -- that we've -- that's attached to the e-mail; correct?

7   A.    I'm -- I would have to --

8   Q.    In fact, this -- what I've shown you as 6 includes a

9   header that has some additional information on it that's not

10  included in the attachment; correct?

11  A.    Oh, correct.  This is from our reporting system.

12  Q.    Okay.

13          MR. HOWARD:  Sorry, Your Honor.  If the witness could

14  refer by exhibit number what he's referencing with "this is."

15          THE COURT:  For the record, was that Exhibit 6, the

16  header that you --

17          THE WITNESS:  Yes, sir.

18          THE COURT:  -- were referring to?

19          THE WITNESS:  Exhibit 6 is from our report system.

20          MR. KUHLMAN:  I'd ask that Defendant's 6 be admitted.

21          MR. HOWARD:  No objection, Your Honor.

22          THE COURT:  Exhibit -- Defendant's Exhibit 6 is

23  admitted without objection.

24  BY MR. KUHLMAN:

25  Q.    So your testimony is that that report existed at the date

1   that's stamped on 6, but the Word copy was what you sent -- or

2   what you received from Agent McKoon in October of '18?

3   A.    Correct, sir.

4   Q.    You were the one that went back and got the consent form

5   from Officer Ferrero; correct?

6   A.    Yes, sir.

7   Q.    Mr. Hooper was not arrested on March the 7th; correct?

8   A.    No, sir.

9   Q.    Was that your decision, to not arrest him?

10  A.    Probably a joint decision with Agent Jarriel.

11  Q.    And when did the discussion occur as to whether or not

12  Mr. Hooper should be arrested?

13  A.    While we were on the scene.  I can't tell you the exact

14  moment.  I don't recall.

15  Q.    Before or after Mr. Hooper unlocked the safe?

16  A.    Oh, it would have been after.

17  Q.    Okay.  Before or after Mr. Hooper spoke to y'all in the

18  dining room?

19  A.    After.

20         MR. KUHLMAN:  Okay.  No further questions.

21         THE COURT:  Any redirect, Mr. Howard?

22         MR. HOWARD:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. HOWARD:

25  Q.    The reports you just looked at, other than the header with

1    Chatham-Savannah CNT --

2    A.    Uh-huh.

3    Q.    -- are you aware of any other material differences?

4    A.    I'm not, sir.

5    Q.    And you prepared this report after the Palm Avenue search;

6    correct?

7    A.    Correct.

8    Q.    Were you asked to -- you know, is the report fair and

9    accurate?

10   A.    Yes, sir.

11   Q.    Were you asked to change anything in the report either by

12   myself or anybody at CNT?

13   A.    No, sir.

14   Q.    And does one report -- or one document reflect just the

15   substance of the report, and then the other one with the CNT

16   header is as it exists in the CNT system?

17   A.    Yes, sir.

18   Q.    Okay.  And do they both fairly and accurately describe the

19   events that occurred that day?

20   A.    They do, sir.

21   Q.    Turning to the size of the consent form, did Mr. Hooper

22   indicate at any time that it was too small to read?

23   A.    No, sir.

24   Q.    That he didn't understand --

25   A.    No, sir.

1   Q.    -- what it said?

2         And is that a consent form, based on your experience, that

3   you've seen before?

4   A.    Yes, sir.

5   Q.    And is it clearly legible and understandable?

6   A.    Yes, sir.

7   Q.    Is it all -- in all capitals as well?

8   A.    I would have to reference it.  I don't remember if it's in

9   all capitals.

10  Q.    But you can read and understand it; correct?

11  A.    Yes, sir.

12        MR. HOWARD:  I have no further questions at this

13  time.

14        THE COURT:  Mr. Kuhlman, any recross?

15        MR. KUHLMAN:  Just one quick question.

16                      RECROSS-EXAMINATION

17  BY MR. KUHLMAN:

18  Q.    Agent, Mr. Howard just asked you whether Mr. Hooper said

19  anything about whether he could read it.

20        Do you recall whether Mr. Hooper was wearing glasses, or

21  was he not wearing glasses, as he's sitting here today in the

22  courtroom?

23  A.    I don't recall, sir.

24  Q.    You don't recall one way or the other?

25  A.    Correct.

1          MR. KUHLMAN:   Thank you.

2          THE COURT:   May Mr. Hood be excused?

3          MR. HOWARD:   Yes.

4          THE COURT:   Mr. Hood, you can step down.  I'll ask

5    you to exit the courtroom, please.

6          THE WITNESS:   Thank you, sir.

7          MR. HOWARD:   Your Honor, the Government calls

8    Inspector Thomas Plumley.

9       (Thomas Plumley entered the courtroom.)

10         COURT CLERK:   Sir, you have previously been sworn.

11   If you would, please, just be seated.

12         State your name and your occupation for the record.

13         THE WITNESS:   Thomas Plumley, United States Postal

14   Inspector.

15                       THOMAS PLUMLEY,

16   having been previously sworn, was examined and testified as

17   follows:

18                      DIRECT EXAMINATION

19   BY MR. HOWARD:

20   Q.   What are your duties and responsibilities as the postal

21   inspector?

22   A.   I'm a federal agent for the United States Postal Service.

23   We investigate any federal crimes involving the use of the

24   mails: drugs in the mail, guns in the mail, so forth.

25   Q.   Are you familiar with the investigation, what we're here

1    about?

2    A.    Yes, sir.

3    Q.    And before becoming a postal inspector, what did you do

4    previously?

5    A.    I was a United States probation officer.

6    Q.    On March 7, 2018, did you go to 8 Palm Avenue to assist in

7    executing a warrant for Barrington Miller?

8    A.    Yes, sir.

9    Q.    And were you one of the agents who went inside initially

10   to do a protective sweep?

11   A.    No, sir.

12   Q.    Did you eventually go inside that house and speak with

13   Mr. Hooper?

14   A.    Yes, sir.

15   Q.    And when you went in to speak with Mr. Hooper, where was

16   he?

17   A.    Mr. Hooper was in the living area -- living room area, and

18   we walked over to the dining room and sat down at his dining

19   room table.

20   Q.    Okay.  Was he sitting on the couch?

21   A.    He was, yes, sir, on the couch.

22   Q.    Who else was in the room?  Do you recall any other agents

23   in the room when you --

24   A.    I remember there was numerous agents in the room.  I

25   remember McKoon -- Agent McKoon was in the room.  Other than

1    that, there was other people.

2    Q.    When you went in there and Mr. Hooper is sitting there,

3    was he handcuffed?

4    A.    No, sir.

5    Q.    Was he under arrest?

6    A.    No, sir.

7    Q.    Did he seem cooperative?

8    A.    Yes, sir.

9    Q.    And did you stay in the living room there with him, or did

10   you guys go somewhere else?

11   A.    We went to the dining room.

12   Q.    And just explain to the Court where the dining room is in

13   relation to where the living room is where he was seated.

14   A.    It was a -- it wasn't a very large house.  You walked in

15   the front door.  There was a living room area.  And off to the

16   left, right off the living room, was a dining room.  I call it

17   a dining room because there was a large table there.  There was

18   no door in between the two of them.  It was just an opening.

19   Q.    How was everyone seated at the table?

20   A.    Mr. Hooper was seated across from me.  We were on one side

21   of the table, and then Agent McKoon was on the other side of

22   the table.

23   Q.    Okay.  So when you say Mr. Hooper was across from you,

24   what does that mean?  Was he next to you or across from you?

25   A.    We were sitting facing each other --

79

Q.    Okay.

A.    -- on the same side of the table.  So if you -- the table he's sitting at, we were facing each other like that.

Q.    Okay.  Were your guns drawn?

A.    No, sir.

Q.    So it's you and Agent McKoon at that table; correct?

A.    Yes, sir.

Q.    How would you describe the tone of that conversation?

A.    It was a cordial interview.  Mr. Hooper was cooperative. We, you know, asked the questions, and he answered our questions.

Q.    Were you screaming at him?

A.    No, sir.

Q.    Was this conversational?

A.    Yes, sir.

Q.    Did he appear afraid?

A.    No, sir.

Q.    Did he appear confused?

A.    No, sir.

Q.    Did he appear lucid? coherent?

A.    Yes, sir.

Q.    And was that interview recorded?

A.    Yes, sir.

Q.    I'd ask you to turn to Exhibit O.

A.    Bear with me.  There's lots of --

80

1   Q.   Yeah.

2   A.   -- folders here.

3   Q.   There are a lot of folders.   Looking for Exhibit O.

4        Do you recognize that?

5   A.   Yes, sir.   This is a CD with my initials on it.

6   Q.   And what's contained on that CD?

7   A.   What's the date on the CD?

8   Q.   What's contained on that CD?

9   A.   Oh, I believe this is the CD of audio recording.

10  Q.   Of what?

11  A.   Of the interview with Mr. Hooper.

12  Q.   And does that fairly and accurately reflect the audio of

13  your interview with Mr. Hooper?

14  A.   Yes, sir.

15  Q.   And you initialed it; correct?

16  A.   Yes, sir.

17       MR. HOWARD:   If we could pull up Exhibit O.

18  (Inaudible.)

19  BY MR. HOWARD:

20  Q.   Is this audio only, or is there video?

21  A.   Audio only.

22  Q.   Okay.

23       MR. HOWARD:   Go ahead and play it.

24       (Audio playing.)

25       MR. HOWARD:   You can pause it.

1         (Audio paused.)

2    BY MR. HOWARD:

3    Q.    Why did you tell him that -- well, do you recognize your

4    voice there?

5    A.    Yes, sir.

6    Q.    Are you the one that tells him he's not under arrest?

7    A.    Yes, sir.

8    Q.    Why do you tell him that he's not under arrest?

9    A.    He wasn't under arrest.

10   Q.    That's the truth?

11   A.    Yes, sir.

12   Q.    Why do you tell him that you're a federal officer?

13   A.    Let him know what I am.  We identify ourselves.  I, at

14   that point, had already showed him my credentials to identify

15   myself, so he knew who I was.

16   Q.    Okay.

17         (Audio playing.)

18         (Audio paused.)

19   BY MR. HOWARD:

20   Q.    When you say, "I know you gave us consent to search your

21   house; right?" why do you say that?

22   A.    I wanted to make sure that he knew that he gave consent to

23   search.  I, at that point, had already seen the consent to

24   search form, but I wanted to make sure that he was the one that

25   signed that and that we did have consent.

82

1   Q.   Okay.  And at any time, did he revoke that consent?

2   A.   No, sir.

3   Q.   Did he tell you that he didn't understand it?

4   A.   No, sir.

5   Q.   Did he tell you that the font was too small?

6   A.   No, sir.

7   Q.   After you asked him, "I know that you gave us consent to

8   search your house; right?" what was his response?

9   A.   He said, "Yes."

10       (Audio playing.)

11            MR. HOWARD:  You can pause it there.

12       (Audio paused.)

13  BY MR. HOWARD:

14  Q.   There's a reference to his girlfriend.

15       Do you know who he's referring to there?

16  A.   Yeah.  There was another -- there was a female at the

17  house.  We initially thought it was his wife, but it turned out

18  it was his girlfriend.

19  Q.   And was that Iesha Griffin?

20  A.   Yes, sir.

21  Q.   And he mentioned that they were at the house?

22  A.   Yes, sir.

23            MR. HOWARD:  (Inaudible.)

24       (Audio playing.)

25       (Audio paused.)

1  BY MR. HOWARD:

2  Q.   Why are you telling him again and reiterating he's not

3  under arrest?

4  A.   It was a consensual interview.  He wasn't under arrest.

5  Q.   And then why do you tell him that you're a federal

6  officer?

7  A.   There's a thing called 18 U.S.C. 1001, false statements.

8  I wanted to make sure that he knew that if he lied to me he

9  could be charged with false statements.

10 Q.   Okay.  Were you lying about him being under arrest at the

11 time?

12 A.   No, sir.

13 Q.   Were you lying about the law as it existed?

14 A.   No, sir.

15 Q.   And by telling him that he's not under arrest, were you

16 threatening him in any way?

17 A.   No, sir.

18       MR. HOWARD:  All right.  If we could go -- skip ahead

19 to 7:51.

20       (Audio playing.)

21       (Audio paused.)

22 BY MR. HOWARD:

23 Q.   What are you referring to there when you say, "You already

24 gave consent, and your girlfriend said we could look as well"?

25 A.   We had consent to be in the house.  We had consent to

1    search the house.

2    Q.    And the reference to the girlfriend is who?

3    A.    His girlfriend, Ms., I believe, Miller [sic].

4    Q.    And you were there during the execution of the search

5    warrant and aware of the consent that had been given; correct?

6    A.    Yes, sir.

7    Q.    Both from Mr. Hooper but also Ms. Griffin?

8    A.    Yes, sir.

9            MR. KUHLMAN:  I'm going to object to references to

10   the execution of a search warrant.  There was no warrant.

11           MR. HOWARD:  I'll --

12           THE COURT:  That objection is sustained.

13           Do you want to withdraw your question and restate it?

14           MR. HOWARD:  Yeah.  Let me rephrase it.

15   BY MR. HOWARD:

16   Q.    There was no search warrant at that house; correct?

17   A.    No, sir.

18   Q.    Okay.  The -- were you aware that consent had been given

19   to search that house?

20   A.    Yes.

21   Q.    And from whom did law enforcement obtain consent to search

22   that house, as you were aware at the time you were doing the

23   search?

24   A.    Mr. Hooper and his girlfriend.

25           MR. HOWARD:  All right.  If we could skip ahead to

1    the end.

2    BY MR. HOWARD:

3    Q.    And during this interview, did he make various

4    incriminating statements about the drugs and the marijuana?

5    A.    Yes, sir.

6    Q.    Basically, a confession; right?

7    A.    Yes, sir.

8    Q.    During this interview, did he appear cooperative?

9    A.    Yes, sir.  He was very cooperative.

10          MR. HOWARD:  If we could skip ahead to the 22-minute

11   mark.

12       (Audio playing.)

13       (Audio paused.)

14   BY MR. HOWARD:

15   Q.    This interview ended at 9:11 p.m.; correct?

16   A.    Yes, sir.

17   Q.    How -- approximately how long -- we were just at the

18   22-minute mark.

19       Approximately how long was this interview?

20   A.    I think it was around 45 minutes.

21   Q.    The interview was 45 minutes?

22   A.    I believe so.  I don't -- I don't remember the time.

23          MR. HOWARD:  Start -- push play at the 1 second mark.

24       (Audio playing.)

25       (Audio paused.)

1   BY MR. HOWARD:

2   Q.    Is this the start of the interview?

3   A.    Yes, sir.

4            MR. HOWARD:   Can you go to the 22-minute mark that he

5   was listening to.

6         (Audio playing.)

7         (Audio paused.)

8   BY MR. HOWARD:

9   Q.    Is that the end of the interview?

10  A.    Yes, sir.

11  Q.    Was there -- was the interview entirely being recorded

12  that you have with Mr. --

13  A.    Yes, sir.

14  Q.    And, again, having listened to this audio now, how long

15  was the interview of Mr. Hooper?

16  A.    About 22 minutes.

17  Q.    There wasn't some second part that was unrecorded with you

18  interviewing Mr. Hooper; right?

19  A.    No, sir.

20  Q.    If we could -- and you reviewed body-worn camera in this

21  case?

22  A.    Yes, sir.

23  Q.    If you would, go to Exhibit N.

24  A.    (Inaudible.)

25  Q.    N as in Nancy.

1    A.    It's a CD with my initials on it.

2    Q.    And do you recognize that as the body-worn camera clip --

3    or a part of the body-worn camera from that evening?

4    A.    Yes, sir.

5    Q.    You were not wearing a body-worn camera; correct?

6    A.    No, sir.

7    Q.    So it's USPIS -- as an inspector, do you typically wear a

8    body-worn camera?

9    A.    We don't have body cameras.

10          MR. HOWARD:   If we could play, with the Court's

11   permission, Exhibit N.

12          THE COURT:   You may.

13      (Video playing.)

14          MR. HOWARD:   If we could stop it (inaudible).   All

15   right.   We'll stop it at (inaudible).

16      (Video paused.)

17   BY MR. HOWARD:

18   Q.    Do you recognize what's depicted there?

19   A.    Yes, sir.   That is the kitchen of Mr. Hooper's house.   And

20   right through that doorway is the dining room where we were

21   sitting.

22   Q.    Okay.   Does this depict a time during the interview?

23   A.    Yes, sir.

24   Q.    Are you able to see anybody in here?

25   A.    I believe that's Agent McKoon sitting there in that chair.

88

1   Q.    And across the table is who?

2   A.    Myself and Mr. Hooper are right across the table.

3   Q.    Okay.  All right.  Anytime during your interview with

4   Mr. Hooper, did he say he was unwilling proceed?

5   A.    No, sir.

6   Q.    Did he ever ask for food, water, any necessary medication?

7   A.    No, sir.

8   Q.    You testified he appeared lucid and he understood what --

9   appeared to understand what you were saying; correct?

10  A.    Yes, sir.

11  Q.    Any -- did you physically coerce him into speaking?

12  A.    No, sir.

13  Q.    Point your gun at him?

14  A.    No, sir.

15  Q.    Handcuff him?

16  A.    No, sir.

17  Q.    Did you threaten what would happen to him if he didn't

18  talk?

19  A.    No, sir.

20  Q.    And he was not interviewed even at the end of that -- or

21  he was not arrested even at the end of that interview; correct?

22  A.    No, sir, he was not arrested.

23  Q.    You mentioned that you were previously a probation

24  officer; correct?

25  A.    Yes, sir.

1   Q.   Have you, in the course of your experience, had the

2   opportunity to review individuals' criminal history?

3   A.   Yes, sir.

4   Q.   In this case, did you obtain Vincent Hooper's criminal

5   history?

6   A.   Yes, sir, I did.

7         MR. HOWARD:  Your Honor, I -- if I could approach the

8   witness.

9         THE COURT:  You may.

10        MR. HOWARD:  And I'll mark this for the record as

11   Exhibit Z, and I will also provide a copy to the Court.

12        THE COURT:  Thank you.

13   BY MR. HOWARD:

14   Q.   Inspector, I've handed you what's been marked as

15   Exhibit Z.

16       Do you recognize that?

17   A.   Yes, sir.

18   Q.   What is that?

19   A.   This is printout from the Chatham County Sheriff's Office

20   database with Mr. Hooper's criminal history in Chatham County

21   and then an NCIC printout for Mr. Hooper as well, which I

22   ran -- or had run on March the 9th of 2018.

23   Q.   Okay.  To your knowledge, this was produced very early in

24   discovery; correct?

25   A.   Yes, sir.

1    Q.    And you obtained this criminal history of Mr. Hooper?

2    A.    Yes, sir.

3              MR. HOWARD:  I'd move to admit Exhibit Z as in Zulu.

4              MR. KUHLMAN:  Your Honor, I'm going to object to the

5    admission of this exhibit.  I don't -- I can't find a

6    conviction on here that's more than 10 -- or less than 10 years

7    old.  This is a lot of old criminal history.  I'm not sure of

8    its relevance.  And, you know, to the extent we received a

9    production of 2 terabytes in this case and this was included,

10   I don't think that satisfies the notice requirements under 609.

11             THE COURT:  Mr. Howard, for what purpose do you want

12   to tender --

13             MR. HOWARD:  Sure.

14             THE COURT:  -- the exhibit first?

15             MR. HOWARD:  The relevance -- this isn't 404.  It's

16   not 609.  The relevance of this is one of the factors in

17   assessing voluntariness of consent is someone's age, education,

18   experience.  We've argued in our brief that that experience

19   includes criminal experience, their experience with law

20   enforcement, whether they knew they had the opportunity to

21   revoke consent, whether they knew they had the right to not

22   consent to a search.

23             THE COURT:  The evidence is tendered for that limited

24   purpose; is that correct?

25             MR. HOWARD:  Yes, Your Honor.

91

1          THE COURT:  It's admitted for that limited purpose.

2    Objection is overruled.

3          MR. KUHLMAN:  Thank you, Your Honor.

4    BY MR. HOWARD:

5    Q.    Now, Inspector Plumley, you've reviewed Exhibit Z?

6    A.    Yes, sir.

7    Q.    Can you tell me a little bit about the extent of this

8    individual's criminal history as it relates to his interaction

9    with law enforcement?

10   A.    Yes, sir.  According to the -- this NCIC printout, his

11   first arrest was in 1982 for burglary, and then his last arrest

12   was in -- besides the instant offense, the last arrest was in

13   2003, Cycle 13, Savannah Police Department, simple battery.

14   Q.    And between 1982 and 2003, are there multiple arrests?

15   A.    Yes, sir.  There's a total of 12 arrests.

16   Q.    Multiple convictions?

17   A.    Yes, sir.  First --

18   Q.    And based on your training and experience, does this show

19   someone who's familiar and experienced with dealing with law

20   enforcement?

21   A.    Yes, sir.

22          MR. HOWARD:  I have no further questions for this

23   witness.  Actually, if I could withdraw that briefly.

24          THE COURT:  You may.

25                  (No omissions)

1   BY MR. HOWARD:

2   Q.   You obtained a consent form in this case; correct?

3   A.   Yes, sir.

4   Q.   And you reviewed the consent form?

5   A.   Yes, sir.

6   Q.   Not just a copy but the original consent form; correct?

7   A.   Yes, sir.

8   Q.   Is that consent form in small font, or is it readable?

9   A.   It's readable.

10  Q.   And approximate size of that consent form?

11  A.   It's on a regular piece of paper.  I don't -- 8 and a half

12  by 11, I guess, would be the --

13          MR. HOWARD:  I have --

14  A.   -- my best --

15          MR. HOWARD:  -- no further questions for this

16  witness.

17          THE COURT:  Mr. Kuhlman, any cross?

18          MR. KUHLMAN:  I have a few, Your Honor.

19                     CROSS-EXAMINATION

20  BY MR. KUHLMAN:

21  Q.   Good afternoon, Inspector Plumley.

22  A.   Good afternoon.

23  Q.   My name is Cameron Kuhlman, and I have just a few

24  questions to follow up on Mr. Howard's questions.

25          If you'll turn -- earlier, we admitted -- (inaudible)

1    exhibits -- Exhibit M in the stack that you've got there.

2            MR. KUHLMAN:   Does the Court have a copy?

3            THE COURT:   I believe I do, Mr. Kuhlman.

4            That's M as in Michael?

5            MR. KUHLMAN:   That is correct.

6            THE COURT:   Yes, I do.   Proceed.

7    BY MR. KUHLMAN:

8    Q.   Do you recognize that as your -- the memorandum of

9    interview with your name on it?

10   A.   Yes, sir.

11   Q.   Okay.  Is that the memo -- is this the memo that you

12   completed in this case with reference to this incident?

13   A.   Yes, sir.

14   Q.   It says the date of interview is March the 7th.  I don't

15   see anywhere here where it says the date that you created the

16   memo.

17        Do you recall the date you created the memo?

18   A.   I don't know the exact date.  I would have created it the

19   next day or the day after.

20   Q.   Okay.  Meaning the next day or the day after March the

21   7th?

22   A.   Yes, sir.  I did not -- I can -- I did not create this

23   that night because it was late when we got back.

24   Q.   Sure.  I understand that.

25        And forgive me if I mess this up, but the postal service,

1 do they have an equivalent of a 302 form or some other

2 reporting document that you would use in a case like this?

3 A. No, sir.  We do memorandums of interviews.  We don't have

4 a 302.

5 Q. Right.  So this -- so to the extent that there are

6 references to the Plumley report, this is the document?

7 A. Yes, sir.

8 Q. Okay.  The audio recording, is that a doc- -- that's

9 something that you've made using a recorder that you have that

10 you use in your investigations; correct?

11 A. Yes, sir.  It's a recorder that's assigned to me, and it's

12 just a handheld recorder.

13 Q. So you had it there for the night.

14   You could have had that thing rolling at any point during

15 this stop; correct?

16 A. Actually, it was in the vehicle.  When we did the

17 interview, I went and got the recorder to bring in for the

18 interview.  I don't carry the recorder on me at all times.

19 Q. All right.  Were you present for the interaction in which

20 Mr. Hooper executed this consent form?

21 A. No, I was not.

22 Q. Were you outside the house, anywhere inside the house, or

23 you don't remember?

24 A. I don't remember where I was.

25 Q. You do recall telling local law enforcement officers,

1  though, to turn off their body cameras when y'all sat down to

2  have the interview?

3  A.   I don't remember telling anybody that.

4       MR. KUHLMAN:   Okay.   No further questions for this

5  witness.

6       THE COURT:   Mr. Howard, any redirect?

7                     REDIRECT EXAMINATION

8  BY MR. HOWARD:

9  Q.   Inspector Plumley, have you had the opportunity to review

10  your memorandum of interview today?

11  A.   Yes, sir.

12  Q.   Is it fair and accurate?

13  A.   Yes, sir.

14  Q.   And in the practice -- you mentioned that you create these

15  memorandum of interviews shortly after the events transpire;

16  correct?

17  A.   Yes, sir.

18       MR. HOWARD:   No further questions.

19       THE COURT:   Any recross, Mr. Kuhlman?

20       MR. KUHLMAN:   Nothing, Your Honor.

21       THE COURT:   May this witness be excused, Mr. Howard?

22       MR. HOWARD:   Yes, Your Honor.

23       THE COURT:   Mr. Plumley, you can step down.   I'd ask

24  you to exit the courtroom, please.

25       THE WITNESS:   Thank you.   Thank you, Judge.

1          THE COURT:  Mr. Howard, call your next witness.

2          MR. HOWARD:  The Government calls Agent Kevin McKoon.

3      (Kevin McKoon entered the courtroom.)

4          THE COURT:  Mr. Howard, just as a road map, do you

5  anticipate any other witnesses after this one?

6          MR. HOWARD:  No.  Agent McKoon is going to be our

7  last one, Judge.

8          MR. KUHLMAN:  Your Honor, I would have -- I have just

9  one witness.

10          COURT CLERK:  Sir, you have previously been sworn.

11  If you would, please be seated.

12          State your name and your occupation for the record.

13          THE WITNESS:  Agent Kevin McKoon, assigned to the

14  Chatham-Savannah Counter Narcotics Unit.

15                      KEVIN McKOON,

16  having been previously sworn, was examined and testified as

17  follows:

18                   DIRECT EXAMINATION

19  BY MR. HOWARD:

20  Q.   And how long have you been with CNT, Agent McKoon?

21  A.   Approximately 2 years now.

22  Q.   And before CNT, what did you do?

23  A.   I was working with Bloomingdale Police Department.

24  Q.   The evening of March 7th, did you go to 8 Palm to execute

25  a arrest warrant on Barrington Miller?

1    A.    I did.

2    Q.    And while you were there, did you overhear a conversation

3    between Agent Jarriel and a female resident of the house?

4    A.    Yes, I did.

5    Q.    Okay.  Do you recall what was discussed?

6    A.    Agent Jarriel was essentially saying that they believed

7    that there might have been illegal substances still in the

8    house.  He'd asked permission from the female if he could enter

9    the house, search the residence.  At the time, she said yes.

10   She also advised him that she was a resident of the house and

11   could give him permission.

12   Q.    Okay.  If we could play Exhibit J.

13            MR. KUHLMAN:  Say that again.

14            MR. HOWARD:  Exhibit J as in Jackson.

15            And if we could go to the 5:30 mark and pause it

16   there.

17   BY MR. HOWARD:

18   Q.    Do you recognize yourself anywhere in this?

19            MR. HOWARD:  If we could play it.

20   A.    Yes.

21      (Video playing.)

22   A.    That is me just walking --

23      (Video paused.)

24   BY MR. HOWARD:

25   Q.    Go ahead.

1   A.   Yes, sir.  That was me just arriving at the front steps of

2   the residence, the last one in line right there.

3   Q.   Okay.  And what were you doing when you went into that

4   house?

5   A.   That was just a security sweep of the house to make sure

6   there was nobody else -- no other suspects or anything like

7   that to be concerned about.

8   Q.   When you did that security sweep, did you find any guns or

9   drugs or people hiding?

10   A.   I did not, no.

11          MR. HOWARD:   If you could skip ahead to 7:30.

12      (Video playing.)

13   BY MR. HOWARD:

14   Q.   And do you see yourself walking out of the house?

15   A.   Yes, I do.

16          MR. HOWARD:   Let me pause it there.

17      (Video paused.)

18   BY MR. HOWARD:

19   Q.   Later, did you go back into the house eventually?

20   A.   I did.

21   Q.   And what happens when you go back into that house?

22   A.   When I returned into the residence, Mr. Hooper was inside.

23   He was sitting in -- on a couch in the living room.  As you go

24   in the front door, it's to the left-hand side.  Briefly spoke

25   to him for a few minutes.  Postal Inspector Plumley and I and

1    Mr. Hooper all moved into the dining room area, sat at the

2    dining room table.

3    Q.    Okay.  And when you were --

4          MR. HOWARD:  If we could go to the 11:40 mark of

5    Exhibit J.

6          (Video playing.)

7          MR. HOWARD:  If we could pause it there.

8          (Video paused.)

9    BY MR. HOWARD:

10   Q.    And do you recognize yourself -- we have now paused it at

11   the 11:47 mark in Exhibit J.

12         Do you see yourself in that?

13   A.    I do, standing in the doorway between the living room and

14   dining room.

15   Q.    Okay.  And what's happening at this point?

16   A.    That was when I was standing in -- I know there's hard

17   shadows to see there, but Mr. Hooper is sitting on the couch at

18   that time.

19   Q.    Was Mr. Hooper handcuffed at that time?

20   A.    No, he was not.

21   Q.    Were you yelling at him?

22   A.    No, sir.

23   Q.    Were you threatening him?

24   A.    No, sir.

25   Q.    Was there a weapon pointed at him?

100

1    A.    No, sir.

2    Q.    At some point, did Agent Hood then bring a consent form

3    into the house?

4    A.    Yes.

5    Q.    And did Mr. Hooper sign that consent form?

6    A.    Yes, he did.

7    Q.    At any time, did he indicate that he could not read or

8    understand that consent form?

9    A.    No, sir.

10   Q.    Did you sign it as a witness at the bottom of that consent

11   form?

12   A.    Yes, I did.

13   Q.    And after signing the consent form, did you and

14   Inspector Plumley conduct a recorded interview with Mr. Hooper?

15   A.    We did, in the dining room.

16   Q.    Okay.  So you did that in the dining room?

17   A.    Yes, sir.

18   Q.    During that interview, was he handcuffed?

19   A.    No, sir.

20   Q.    Were guns drawn?

21   A.    No, sir.

22   Q.    Where was your gun?

23   A.    In my holster on my thigh.

24   Q.    Did Mr. Hooper seem cooperative?

25   A.    Yes, he did.

1  Q.    Did you or Inspector Plumley threaten him with physical

2  violence?

3  A.    No, sir.

4  Q.    Did you threaten that anything would happen if he didn't

5  talk?

6  A.    No.

7  Q.    Did you make him any false promises?

8  A.    No, sir.

9  Q.    Did you or Inspector Plumley scream or yell at him?

10  A.    No.

11  Q.    Did Mr. Hooper appear to understand the questions?

12  A.    Yes, he did.

13  Q.    And at any time, did he revoke his consent to either

14  search or to speak with you guys?

15  A.    No.

16          MR. HOWARD:  I have no further questions of this

17  witness, Your Honor.

18          THE COURT:  Mr. Kuhlman, your witness.

19          MR. KUHLMAN:  No cross, Your Honor.

20          THE COURT:  All right.  May Mr. McKoon be excused?

21          MR. HOWARD:  Yes.

22          THE COURT:  You may step down.  I'd ask you to please

23  exit the courtroom.

24          MR. HOWARD:  We have no further witnesses,

25  Your Honor.

1          THE COURT:  All right.  Mr. Kuhlman.

2          MR. KUHLMAN:  Call Officer Moustafa, Savannah Police

3   Department.

4      (Amir Moustafa entered the courtroom.)

5          COURT CLERK:  Take the stand, sir.  You also have

6   been previously sworn.  If you would, please be seated.

7          State your name and your occupation for the record.

8          THE WITNESS:  Yes, ma'am.  I'm Amir Moustafa.  I'm an

9   officer with Savannah Police Department.

10                        AMIR MOUSTAFA,

11   having been previously sworn, was examined and testified as

12   follows:

13                     DIRECT EXAMINATION

14   BY MR. KUHLMAN:

15   Q.   Officer Moustafa, thank you for being here this afternoon.

16   My name is Cameron Kuhlman.  I represent Mr. Hooper.  I just

17   have a few questions for you.

18      Can you briefly describe to me your experience at Savannah

19   Police Department?

20   A.   Yes.  So I started as a patrol officer with Central

21   Precinct, and then I moved to the K-9 unit where I currently am

22   working.

23   Q.   And what was your role on -- in March of last year?

24   A.   It was as a K-9 officer, sir.

25   Q.   And do you recall an incident -- responding to an incident

1  on March the 7th of 2018?

2  A.    Yes.

3  Q.    And was that at 8 Palm Avenue?

4  A.    Yes.

5  Q.    Okay.  Do you recall how many other units were involved in

6  that arrest?

7  A.    No, sir.

8  Q.    Did you complete a report?

9  A.    I completed a supplemental report, sir.

10  Q.    Okay.  Did you review any of the other supplemental

11  reports completed by the other officers there?

12  A.    No.

13  Q.    Do you recall that there was a BearCat or SWAT vehicle at

14  the scene?

15  A.    I do -- I do not recall, sir, if there was or wasn't.

16  Q.    Can you describe your role in executing this particular

17  arrest?

18  A.    Yes.  My K-9, K-9 Sam, he searched -- he did a free-air

19  sniff of two vehicles and a -- I believe, a bag.

20  Q.    Okay.  Prior to that, did you -- what was your role prior

21  to your K-9 being involved?

22  A.    I do not recall.  I do not recall at this point.  I do

23  believe I assisted in some way in clearing the house, but I do

24  not recall how I did that.

25  Q.    Okay.

1          MR. KUHLMAN:   Your Honor, may I approach?

2          THE COURT:   You may.

3   BY MR. KUHLMAN:

4   Q.    I'm going to show you what's marked as Defendants'

5   Exhibit 3.

6          Can you tell me if you recognize that supplemental report?

7   A.    Yes, sir.  That's supplemental.  It would pertain, I

8   believe, to this . . .

9   Q.    Well, let me ask you this.

10  A.    Yes.

11  Q.    It's a report authored by Officer Garcia, but --

12  A.    Uh-huh.

13  Q.    -- do you agree that it describes your activities in part

14  within part of the report?

15  A.    Because I cannot recall -- I didn't read the other

16  supplementals and it's been a minute, I do not have a visual --

17  I can't give you a definitive answer.  Over here, it says

18  "Mell Street," so I don't know if this is the same event or not

19  because we have -- for SWAT, we have different operations as

20  well, and they could coincide on the same day.

21         So I'm looking for a time.  It's -- the date is -- seems

22  to be correct.  I believe it is March 7th that the incident

23  that we were originally talking about occurred.  But, again,

24  I don't -- I didn't read this supplemental.  I don't doubt

25  what's written in here.  I have taken a shield position before,

1    but I cannot give you a definitive answer as to if that

2    occurred that day at that location or if it was that day at a

3    different location.

4    Q.    Do you recall whether you had participated in multiple

5    arrests on March the 7th of 2018?

6    A.    I can search my records and get back to you, sir.

7              THE COURT:  Mr. Kuhlman, do you have a copy of

8    Exhibit 3 for me?

9              MR. KUHLMAN:  I do, Your Honor.  Please disregard my

10   (inaudible).

11   BY MR. KUHLMAN:

12   Q.    So -- just so I'm clear, you had -- you could review your

13   records.  But sitting here today, you can't recall whether you

14   participated in one or multiple arrests on March the 7th of

15   2018?

16   A.    Correct, because I'm going off of memory and not actual

17   facts.  And I'm not willing to give a statement based on my

18   memory that goes back over about 10 months.  A lot has happened

19   since.  I do not feel comfortable giving you a statement based

20   on my memories, which are vague regarding this situation,

21   outside of what I wrote in my supplemental regarding my role as

22   a K-9 officer.

23   Q.    And I think that that is probably something that you would

24   extend to all officers; correct?  It should not -- you want to

25   be careful not just because you're a K-9 officer.  You want to

1  be careful because you're a law enforcement officer; correct?

2  A.   I do not want to make a statement that is not factual on

3  this stand or any other place, so I have to go on what I know.

4  And if you're telling -- and the incident occurred in a

5  significant amount of time where it's not fresh in my brain, so

6  I would have to go over the records and check.

7      I don't have access to the other videos that were on, you

8  know, and so I'd have to read the other supplementals and the

9  records to see.  So the only supplemental I read for this case

10  is the one that I wrote.

11  Q.   Okay.  And what do you recall from the supplemental that

12  you read for this case?

13  A.   Uh-huh.  It said that I assisted in the clearing of the

14  house and that my dog conducted a free-air sniff of two

15  vehicles.  I believe one was a Honda, and the other was an --

16  I believe it was an Infinity.  I checked the report, but the --

17  and there was a bag as well.  So the dog searched -- conducted

18  a free-air sniff of those three things.  So it would be

19  assisting in clearing the residence and then the two vehicles

20  and the bag, sir.

21          MR. KUHLMAN:  No further questions, Your Honor.

22          THE COURT:  Mr. Howard, any cross?

23          MR. HOWARD:  Well, just for housekeeping, was that --

24  did we move to admit that --

25          THE COURT:  It's not been offered.

1          MR. HOWARD:  Okay.

2          MR. KUHLMAN:  We did not.

3          MR. HOWARD:  Okay.  And so the record's clear, what

4    Exhibit Number was it?

5          THE COURT:  I believe it was Defendant's 3, the

6    Garcia supplemental.

7          MR. HOWARD:  John Garcia.  Okay.

8                     CROSS-EXAMINATION

9    BY MR. HOWARD:

10   Q.   If you could refer back to that, that's not a report

11   drafted by you; correct?

12   A.   That's correct.

13   Q.   It's a report made by somebody else?

14   A.   Yes, sir.

15   Q.   And looking at that, it talks about a arrest and search

16   warrant at an address on Mell Street; correct?

17   A.   Yes, sir.

18   Q.   Okay.  Not Palm Avenue?

19   A.   As far as what the supplemental says --

20   Q.   It doesn't --

21   A.   -- not --

22   Q.   -- reference anything about Palm Avenue?

23   A.   No, sir.

24   Q.   Okay.  But you did a report about Palm Avenue, didn't you?

25   A.   Yes, sir.

1    Q.    And you looked at that?

2    A.    Yes, sir.

3    Q.    And you looked at your body camera from Palm Avenue;

4    correct?

5    A.    Yes, sir.

6            MR. HOWARD:   All right.   I have no further questions,

7    Your Honor.

8            THE COURT:   Mr. Kuhlman, any redirect?

9            MR. KUHLMAN:   Just one question.

10                      REDIRECT EXAMINATION

11   BY MR. KUHLMAN:

12   Q.    Officer Moustafa --

13   A.    Uh-huh.

14   Q.    -- in your body cam footage that you reviewed for this

15   case, do you recall whether that footage involved -- or

16   captured an incident where Mr. Hooper unlocked the safe in the

17   back room?

18   A.    The footage that I viewed involved my dog and vehicle,

19   so I would -- I do not recall what you're referring to in the

20   video.

21   Q.    When did you review the video footage?

22   A.    I believe it was -- it was either -- I believe it was

23   yesterday, but I would have to check if it was yesterday or

24   before yesterday.   But I believe it was yesterday.   There's a

25   record of it on the -- evidence.com.   And I actually notated

1    it, too, as the date --

2    Q.    All right.

3    A.    -- on there.  But I don't recall exactly if it was

4    yesterday or the day before, but it was very recent for --

5    Q.    Okay.  I --

6    A.    -- for this case, so -- for this hearing, rather.

7    Q.    I apologize.  I don't mean to interrupt.

8    A.    Uh-huh.

9    Q.    I understand your testimony earlier that you can't

10   remember things that happened in March of last year.  That's

11   been some time ago.  But now you're testifying that you

12   reviewed the video --

13   A.    Uh-huh.

14   Q.    -- yesterday.

15         But you can't tell me whether you recall from your review

16   of the video yesterday whether or not that video captures a

17   moment in which Mr. Hooper unlocks the safe?

18   A.    I do not -- I didn't know what Mr. Hooper looked like, and

19   so I can recall the focus of the footage being on the dog and

20   the vehicle.  I do not recall Mr. Hooper being near a safe in

21   that video because the scene was outside, and you're referring,

22   I believe, according to what you told me, to a scene inside the

23   house.  So I was outside in -- on the video with the dog in my

24   video that I captured on my body camera.

25             MR. KUHLMAN:   Nothing further.

1          MR. HOWARD:   Nothing from the Government, Your Honor.

2          THE COURT:   May this witness be excused?

3          MR. KUHLMAN:   Yes.

4          THE COURT:   Officer Moustafa, you may step down.

5          THE WITNESS:   Thank you, Your Honor.

6          THE COURT:   I'd ask that you please leave the

7    courtroom.

8          THE WITNESS:   Yes, sir.

9          THE COURT:   Thank you.

10          Mr. Kuhlman, any other witnesses or evidence?

11          MR. KUHLMAN:   If you'll allow me to confer with

12    Mr. Howard for just one moment.

13          THE COURT:   Of course.

14        (Counsel conferred.)

15          MR. HOWARD:   Go ahead.

16          MR. KUHLMAN:   Okay.  Your Honor, we have the

17    supplemental report from Officer Ferrero that's been premarked

18    as Defendant's Exhibit 2.  In the interest of economy here, the

19    Government has agreed to stipulate to the admissibility of

20    Defendant's 2 and -- without the need to call Officer Ferrero.

21          THE COURT:   That's fine.  Defendant's 2, the Ferrero

22    supplemental report, is admitted without objection.

23          Gentlemen, do you want to attach 3 and put it in

24    since it was discussed?

25          MR. HOWARD:   Is that the Garcia report?

1          THE COURT:   That's the Garcia report.   I mean, you've
2   got testimony on it.   I think you ought to admit it.
3          MR. HOWARD:   I would like to.
4          Are you . . .
5          THE COURT:   Yeah.   I'm going to -- unless there's any
6   objection, Mr. Kuhlman, I'm going to admit 3, the Garcia report
7   as well.
8          MR. KUHLMAN:   That's -- I understand.
9          THE COURT:   All right.   So, Mr. Kuhlman, by my count,
10   we've admitted Defendant's 2, 3, 5, and 6; correct?
11          MR. KUHLMAN:   That is correct, Your Honor.
12          THE COURT:   All right.   Any additional evidence or
13   witnesses?
14          MR. KUHLMAN:   No additional evidence or witnesses.
15   I do have some argument.
16          THE COURT:   I will entertain argument, please.
17          MR. HOWARD:   Your Honor, before that, could I have
18   permission to just -- to address this report?   Could I have
19   permission to re-call Agent Jarriel?
20          THE COURT:   You absolutely may.
21          MR. KUHLMAN:   And, again, Your Honor, I did not
22   proffer the exhibit, so, I mean, to the extent that they're not
23   going to -- this is not -- I did not intend to open up an
24   opportunity -- and I don't think that they have the opportunity
25   to clean that up.   It's not -- the Court admitted it

1     sua sponte.

2          THE COURT:   I'm going to hear the testimony.

3          MR. KUHLMAN:   Okay.

4          THE COURT:   Thank you.

5          COURT CLERK:   Sir, again, you have previously been

6     sworn.

7          Please be seated and state your name and your

8     occupation again.

9          THE WITNESS:   Kevin Jarriel, the Counter Narcotics

10    Team in Savannah.

11                    KEVIN JARRIEL,

12    having been previously sworn, was re-called and examined and

13    testified as follows:

14               FURTHER REDIRECT EXAMINATION

15    BY MR. HOWARD:

16    Q.   Agent Jarriel, were you involved in the search of a

17    residence on Mell Street related to this case?

18    A.   I did not particularly search the residence; however, I

19    was involved in the planning and obtaining of the search

20    warrant for a residence on Mell Street.

21    Q.   And when did that search occur?

22    A.   That was on the 6th of March.

23    Q.   So a separate day --

24    A.   Yes.

25    Q.   -- than the search of Palm Avenue; correct?

1   A.    Correct.

2   Q.    And do you know if SWAT was involved with that March 6th

3   search of the Mell Street address?

4   A.    Yes, sir.  We did solicit their assistance for the

5   execution of the search warrant on Mell Street.

6   Q.    And was the SWAT operation -- was it the same SWAT that

7   was involved in the March 7th search of Palm?

8   A.    No.  It was a -- it was not.  There were officers -- there

9   could have been officers -- you know, Green, Moustafa, one,

10  they could have been at the same residence.  I'm not sure if

11  they were assigned to Mell Street.  But it was not a SWAT

12  operation on 8 Palm Avenue at all.

13  Q.    And the reports for the various searches that were done in

14  this case by Savannah PD, did you locate those reports --

15  A.    Yes, sir.

16  Q.    -- and provide them to me?

17  A.    Yes, sir.

18  Q.    And were those produced in discovery based on your

19  understanding?

20  A.    Yes, sir.

21  Q.    And with respect to body cameras, did you check multiple

22  times regarding the available body cameras with respect to the

23  Savannah Police Department in this case?

24  A.    Yes, sir.  Anything specific to that case number, we

25  obtained all body camera footage.

1          MR. HOWARD:   I have no further questions, Your Honor.

2          THE COURT:   Mr. Kuhlman, any cross?

3                        RECROSS-EXAMINATION

4    BY MR. KUHLMAN:

5    Q.    Agent Jarriel, just to be clear, the report refers to

6    March the 7th, so that was a mistake by the supplemental --

7    the supplemental officer; correct?

8    A.    Yes, sir.  I believe so.  We had executed the search

9    warrant on the 6th of March, I believe, uh-huh.

10   Q.    So officers make mistakes when they make these reports?

11   A.    Yes, sir.  With dates, they can, yes, sir.

12         MR. KUHLMAN:   Nothing further.

13         THE COURT:   Any additional evidence from either

14   party?

15         MR. HOWARD:   No, Your Honor.  Nothing from the

16   Government.

17         THE COURT:   All right.  You may step down,

18   Mr. Jarriel.

19         THE WITNESS:   Thank you, Judge.

20         THE COURT:   Mr. Kuhlman, I'll entertain your argument

21   first.

22         MR. KUHLMAN:   Thank you.

23         Your Honor, as I said in the opening, this is a

24   pretty straightforward question, whether or not the Government

25   can carry its burden or show consent by Mr. Hooper when

1   numerous officers, with weapons drawn, flak jackets on, storm

2   up to a house and say, "Everybody come out.  We're here to

3   arrest people."

4          This business about Ms. Griffin giving consent is a

5   late bloomer.  The first we heard about that is in their

6   briefs.  The -- it doesn't really matter anyway because even

7   if she gives consent for the protective sweep, the protective

8   sweep is not what's at issue here.  The search is the search

9   of the safe.

10          And Mr. Hooper opened the safe by their evidence.

11   It's not Ms. Griffin that opened the safe.  It's not

12   Ms. Griffin that said, "Y'all can open the safe."  It's not

13   Ms. Griffin that provided anything like consent as to the safe.

14          This -- their version of the facts, as I understand

15   them, are that they showed up, politely asked Mr. Hooper, "We

16   need to come in your house.  Is there anything we should be

17   worried about?" and he said, "Oh, yes.  There's quite a lot of

18   drugs and guns.  Let me go show you where they are."

19          This story cannot be read to carry their burden.

20   What they -- what we heard from was multiple officers who

21   can't keep straight which date they were doing what, who can't

22   remember who it was that went in the house, who came out.

23          They've got video and audio capabilities there, and

24   yet they choose to not record the two most critical moments:

25   the moment where they're reviewing the consent form and getting

1   him to sign and the moment where he's supposedly volunteering

2   to open the safe without any coercion.  They have those tools

3   at their disposal, and they didn't use them, and they've

4   offered no legitimate explanation for why.

5           We'll stand on our briefs, but I wanted to draw the

6   Court's attention to just two cases there.  It's the case of

7   *Tovar-Rico*.  It's on our brief at 6.  There, Mr. Tovar had --

8   or Ms. Tovar had already arrived, observed officers explore

9   every room in the apartment, and could not reasonably have

10  known that she could still refuse the search.

11          That's the situation we have here, not whether

12  Mr. Hooper was in handcuffs, not whether there was guns pointed

13  at him, but whether or not, when the -- when officers storm

14  into your house, sweep the whole place, arrest your friend, can

15  you then say, "Oh, no.  Actually, I'd like y'all to go get a

16  warrant"?  That's our question.  That's our case.

17          THE COURT:  Thank you, Mr. Kuhlman.

18          Mr. Howard.

19          MR. HOWARD:  Your Honor, I'm not sure why

20  Iesha Griffin's consent was a late bloomer when it is recorded

21  on video on body-worn camera that was produced in discovery.

22  I appreciate that Mr. Hooper may regret giving that consent,

23  but, nonetheless, he gave it.  And regardless, Iesha Griffin

24  gave it.  That's the question.

25          The question isn't just:  Did Vincent Hooper give

1    consent?  They have consent from a woman who identified herself

2    as a renter, "I rent it."  Okay?  So that gives her the ability

3    to consent.  And, again, we're -- based on what's objectively

4    reasonable to the officer.

5            So the officer has identified somebody who has come

6    out of the house indicating that she lived there, said that she

7    rented it, identifying possessory interest over the property,

8    and giving multiple times a scope of search which is not

9    limited in any way, not limited in duration, not limited in

10   what rooms to be searched.

11           And it's clear not only on the audio, but you've

12   heard, you know, uncontroverted testimony.  The only evidence

13   is that she gave that consent.  She didn't come here and

14   testify and claim that she didn't.  It's on video of her doing

15   that.

16           The Supreme Court has said they were not required to

17   notify her of her right to refuse consent.  That's not their

18   obligation to do so.  She gave them, multiple times, consent

19   to search the house.

20           And Counsel said that she didn't give them consent

21   to do a protective sweep.  Doesn't matter.  First of all, the

22   idea of a protective weep is you don't need consent.  They had

23   a basis to do a protective sweep.  Them going in there is a

24   protective sweep.  But they have already, at that time,

25   consent.

1        They went in there to do the protective sweep out of

2   fear, given that Omar Griffin was still a fugitive, given that

3   there were other individuals who are still fugitives who have

4   taken extended and drastic measures to evade law enforcement,

5   and so they had a reasonable belief that somebody was in there.

6        But regardless, at the time that Iesha Griffin gave

7   consent, which was very early in this recording, which is audio

8   recorded, that was their ticket into the house and to search,

9   including Mr. Hooper's residence.

10        Now, even if Ms. Griffin didn't give consent,

11   Vincent Hooper did.  Again, the uncontroverted testimony is

12   that Vincent Hooper comes out of the house, is speaking with

13   Agent Hood at a time after a pat-down when Agent Hood told him

14   to relax and is not yelling at him, is not threatening.

15   There's no coercive conduct which needs to be alleged.  But

16   there hasn't been.

17        And Vincent Hooper not only gives consent, but he

18   directs them back to his bedroom, tells them where the guns

19   are, opens the locked safe, which only -- you know, they didn't

20   have the combination to either, all of which at a time when

21   he's not being coerced, prodded, or forced to do so.

22        So he's giving them consent.  He's making the

23   admissions.  So now you have not only a basis for the

24   protective sweep, but, also, you have consent from multiple

25   individuals who we come to find out are the two renters of the

1   home.

2           There was a claim by Defense Counsel that at the most

3   crucial time, it wasn't recorded.  Well, it was recorded.

4   Iesha's Griffin's consent was recorded.  The -- it was recorded

5   in writing that he -- that the defendant gave consent.  There

6   was some mention about the font size or the size of that

7   consent form, but, again, there was no testimony that

8   Mr. Hooper did not understand or did not read or was not able

9   to understand it.

10          Indeed, this is someone who is very experienced with

11  law enforcement.  He's 52 years old.  We heard him speak that

12  day to law enforcement.  Sounds lucid.  There's testimony that

13  he is such.  And this was not his first foray or involvement

14  with law enforcement.  This is someone who has decades of

15  experience dealing with being arrested for -- and interacting

16  with law enforcement.  So this is not a novice when it comes to

17  interacting with police.

18          There was *Tovar-Rico*.  We distinguished -- you just

19  heard today about storming into the house.  I'm confused at

20  what point they stormed into the house because the first entry

21  into the house is after Iesha Griffin has given consent and

22  based on a protective sweep, two lawful bases to do so.

23          So when you look at the various factors which this

24  Court -- the Eleventh Circuit instructed this Court to do, you

25  have both Ms. Griffin and Hooper's voluntary consent.  They

1    were not under arrest.  It was voluntary.  They weren't

2    handcuffed.  Guns weren't pointed at them.  There's no

3    deception here.  There's been no allegations that police lied

4    to them, said they had a (inaudible) -- said they had a warrant

5    when they didn't, and they were -- all appear cooperative both

6    on video, audio, and the uncontroverted testimony today.

7         And I think, you know, certainly, one of the

8    factors -- and I didn't address this in the brief, and that's

9    why I want to take a minute to do so now -- is -- what the

10   Eleventh Circuit has said on the six different factors in

11   assessing the voluntariness of the consent is significantly

12   the defendant's belief that no incriminating evidence will be

13   found.

14        Now, certainly, Mr. Hooper had a very good belief

15   that incriminating evidence would be found.  What I ask the

16   Court to consider is Iesha Griffin.  There's been no testimony

17   that Iesha Griffin knew about that, knew about those drugs and

18   knew about that marijuana.  But yet -- and even in Mr. Hooper's

19   recorded interview, he talks about "She doesn't know about it."

20        So her -- at the time she's given consent repeatedly,

21   she has no -- there's no evidence that she has a belief that

22   there's going to be incriminating evidence found there.  That

23   weighs in favor of the Government, as do the other various

24   factors.

25        There's -- I didn't hear much argument regarding the

1   voluntariness of his statements, but, again, I think the crux

2   of that argument relies on it being an illegal search, and I

3   think we've shown here that, just as in the other case, the

4   officers here are erring on the side of caution when they both

5   get oral consents and then written consent to search on top of

6   having a protective sweep.

7        So we think the search was justified.  The statements

8   were justified.  And for that reason, we'd ask the Court to

9   deny the defendant's motion today.

10        THE COURT:  Thank you, Mr. Howard.

11        MR. KUHLMAN:  Your Honor, Mr. Howard referred several

12   times to the Blake factors, and he mentioned the objective

13   reasonableness of the officers in knowing whether or not they

14   (inaudible).  I think the Court needs to also be aware of the

15   reasonable -- whether or not the objectively reasonable citizen

16   in that situation would have known that he could object to the

17   search or that he could withhold his consent.

18        And that's (inaudible) Mendoza, also in our brief,

19   that it -- despite the absence of explicitly coercive police

20   procedure there where the officers were polite, not pushy --

21   as Inspector Plumley testified, they had a very cordial

22   conversation even there -- the Black -- Blake factors resulted

23   in a finding that the defendant was not in the position to feel

24   free to decline the officers' request or otherwise terminate

25   the search.  That's the question here.

1        Mr. Howard is correct that our -- the interview is

2    tied to the search, and the issue there is whether or not you

3    can dump a bunch of drugs and guns on the table and then

4    conduct an interview and that is a voluntary statement.   Thank

5    you.

6            THE COURT:   Thank you, Mr. Kuhlman.

7            Mr. Howard, anything else?

8            MR. HOWARD:   30 seconds.

9            THE COURT:   I'll hold you to it.

10           MR. HOWARD:   Okay.   All right.   So one disting- --

11   one key distinguished -- there are a number of ways we've

12   distinguished *Tovar-Rico* in our brief.   One key there, I think,

13   is that in *Tovar-Rico*, the law enforcement there warned her

14   that if she refused, the agents will come back and get a search

15   warrant.   Right?

16           And that goes into this idea of a reasonable person

17   wouldn't know that they can refuse because they're going to

18   say, "Even if you refuse, we're going to search your house.

19   We're going to get a search warrant.   We're going to do it."

20           Nothing has come out regarding that.   There was no

21   false promises.   There were no threats.   There was no coercive

22   police conduct which would give rise to the violation which

23   they found in *Tovar-Rico*, which certainly didn't exist here.

24           They didn't push their way in without consent.   They

25   didn't threaten what would happen.   They didn't yell at him

123

1    while they obtained his consent, which they did in *Tovar-Rico*.

2    They didn't wait until the protective sweep was complete.

3    That's when the search -- I've done my 15 seconds.   That's all

4    I have.

5                    THE COURT:   And then some.

6                    All right.   Thank you, gentlemen.   You'll get a

7    ruling.

8                    We stand adjourned.

9                    COURT SECURITY OFFICER:   All rise.

10          (Proceedings recessed at 1:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

124

1                    C E R T I F I C A T E

2

3

4        I, Victoria L. Root, Certified Court Reporter, in and for

5   the United States District Court for the Southern District of

6   Georgia, do hereby certify that the foregoing transcript of the

7   proceedings held in the above-entitled matter was transcribed

8   to the best of my ability from the Court's electronic recording

9   system and that the transcript page format is in conformance

10  with the regulations of the Judicial Conference of the United

11  States.

12        WITNESS MY HAND AND SEAL this 8th day of April, 2019.

13

14

15

16

17

18

19

20        _____

21        VICTORIA L. ROOT, CCR B-1691
          United States Court Reporter
22        Southern District of Georgia
          Savannah Division

23

24  Post Office Box 10552
    Savannah, Georgia  31412
25  (912) 650-4066